(Slip Opinion)          OCTOBER TERM, 2004          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GONZALES, ATTORNEY GENERAL, ET AL. *v.* RAICH ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 03–1454.   Argued November 29, 2004—Decided June 6, 2005

California's Compassionate Use Act authorizes limited marijuana use for medicinal purposes. Respondents Raich and Monson are California residents who both use doctor-recommended marijuana for serious medical conditions. After federal Drug Enforcement Administration (DEA) agents seized and destroyed all six of Monson's cannabis plants, respondents brought this action seeking injunctive and declaratory relief prohibiting the enforcement of the federal Controlled Substances Act (CSA) to the extent it prevents them from possessing, obtaining, or manufacturing cannabis for their personal medical use. Respondents claim that enforcing the CSA against them would violate the Commerce Clause and other constitutional provisions. The District Court denied respondents' motion for a preliminary injunction, but the Ninth Circuit reversed, finding that they had demonstrated a strong likelihood of success on the claim that the CSA is an unconstitutional exercise of Congress' Commerce Clause authority as applied to the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to valid California state law. The court relied heavily on *United States* v. *Lopez,* 514 U. S. 549, and *United States* v. *Morrison,* 529 U. S. 598, to hold that this separate class of purely local activities was beyond the reach of federal power.

*Held:* Congress' Commerce Clause authority includes the power to prohibit the local cultivation and use of marijuana in compliance with California law. Pp. 6–31.

  (a) For the purposes of consolidating various drug laws into a comprehensive statute, providing meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and

strengthening law enforcement tools against international and inter-
state drug trafficking, Congress enacted the Comprehensive Drug
Abuse Prevention and Control Act of 1970, Title II of which is the
CSA. To effectuate the statutory goals, Congress devised a closed
regulatory system making it unlawful to manufacture, distribute,
dispense, or possess any controlled substance except as authorized by
the CSA. 21 U. S. C. §§841(a)(1), 844(a). All controlled substances
are classified into five schedules, §812, based on their accepted medi-
cal uses, their potential for abuse, and their psychological and physi-
cal effects on the body, §§811, 812. Marijuana is classified as a
Schedule I substance, §812(c), based on its high potential for abuse,
no accepted medical use, and no accepted safety for use in medically
supervised treatment, §812(b)(1). This classification renders the
manufacture, distribution, or possession of marijuana a criminal of-
fense. §§841(a)(1), 844(a). Pp. 6–11.

   (b) Congress' power to regulate purely local activities that are part
of an economic "class of activities" that have a substantial effect on
interstate commerce is firmly established. See, *e.g., Perez* v. *United
States,* 402 U. S. 146, 151. If Congress decides that the " 'total inci-
dence' " of a practice poses a threat to a national market, it may regu-
late the entire class. See, *e.g., id.,* at 154–155. Of particular rele-
vance here is *Wickard* v. *Filburn*, 317 U. S. 111, 127–128, where, in
rejecting the appellee farmer's contention that Congress' admitted
power to regulate the production of wheat for commerce did not au-
thorize federal regulation of wheat production intended wholly for the
appellee's own consumption, the Court established that Congress can
regulate purely intrastate activity that is not itself "commercial," *i.e.,*
not produced for sale, if it concludes that failure to regulate that class
of activity would undercut the regulation of the interstate market in
that commodity. The similarities between this case and *Wickard*
are striking. In both cases, the regulation is squarely within Con-
gress' commerce power because production of the commodity meant
for home consumption, be it wheat or marijuana, has a substantial ef-
fect on supply and demand in the national market for that commod-
ity. In assessing the scope of Congress' Commerce Clause authority,
the Court need not determine whether respondents' activities, taken
in the aggregate, substantially affect interstate commerce in fact, but
only whether a "rational basis" exists for so concluding. *E.g., Lopez*,
514 U. S., at 557. Given the enforcement difficulties that attend dis-
tinguishing between marijuana cultivated locally and marijuana
grown elsewhere, 21 U. S. C. §801(5), and concerns about diversion
into illicit channels, the Court has no difficulty concluding that Con-
gress had a rational basis for believing that failure to regulate the in-
trastate manufacture and possession of marijuana would leave a gap-

ing hole in the CSA. Pp. 12–20.

(c) Respondents' heavy reliance on *Lopez* and *Morrison* overlooks the larger context of modern-era Commerce Clause jurisprudence preserved by those cases, while also reading those cases far too broadly. The statutory challenges at issue there were markedly different from the challenge here. Respondents ask the Court to excise individual applications of a concededly valid comprehensive statutory scheme. In contrast, in both *Lopez* and *Morrison*, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety. This distinction is pivotal for the Court has often reiterated that "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez,* 402 U. S., at 154. Moreover, the Court emphasized that the laws at issue in *Lopez* and *Morrison* had nothing to do with "commerce" or any sort of economic enterprise. See *Lopez,* 514 U. S., at 561; *Morrison,* 529 U. S., at 610. In contrast, the CSA regulates quintessentially economic activities: the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational means of regulating commerce in that product. The Ninth Circuit cast doubt on the CSA's constitutionality by isolating a distinct class of activities that it held to be beyond the reach of federal power: the intrastate, noncommercial cultivation, possession, and use of marijuana for personal medical purposes on the advice of a physician and in accordance with state law. However, Congress clearly acted rationally in determining that this subdivided class of activities is an essential part of the larger regulatory scheme. The case comes down to the claim that a locally cultivated product that is used domestically rather than sold on the open market is not subject to federal regulation. Given the CSA's findings and the undisputed magnitude of the commercial market for marijuana, *Wickard* and its progeny foreclose that claim. Pp. 20–30.

352 F. 3d 1222, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined as to all but Part III. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 03–1454

ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* ANGEL MCCLARY RAICH ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 6, 2005]

JUSTICE STEVENS delivered the opinion of the Court.

California is one of at least nine States that authorize the use of marijuana for medicinal purposes.[1] The question presented in this case is whether the power vested in Congress by Article I, §8, of the Constitution "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its authority to "regulate Commerce with foreign Nations, and among the several States" includes the power to prohibit the local cultivation and use of marijuana in compliance with California law.

---

[1] See Alaska Stat. §§11.71.090, 17.37.010–17.37.080 (Lexis 2004); Colo. Const., Art. XVIII, §14, Colo. Rev. Stat. §18–18–406.3 (Lexis 2004); Haw. Rev. Stat. §§329–121 to 329–128 (2004 Cum. Supp.); Me. Rev. Stat. Ann., Tit. 22, §2383–B(5) (West 2004); Nev. Const., Art. 4, §38, Nev. Rev. Stat. §§453A.010–453A.810 (2003); Ore. Rev. Stat. §§475.300–475.346 (2003); Vt. Stat. Ann., Tit. 18, §§4472–4474d (Supp. 2004); Wash. Rev. Code §§69.51.010–69.51.080 (2004); see also Ariz. Rev. Stat. Ann. §13–3412.01 (West Supp. 2004) (voter initiative permitting physicians to prescribe Schedule I substances for medical purposes that was purportedly repealed in 1997, but the repeal was rejected by voters in 1998). In November 2004, Montana voters approved Initiative 148, adding to the number of States authorizing the use of marijuana for medical purposes.

## I

California has been a pioneer in the regulation of marijuana. In 1913, California was one of the first States to prohibit the sale and possession of marijuana,[2] and at the end of the century, California became the first State to authorize limited use of the drug for medicinal purposes. In 1996, California voters passed Proposition 215, now codified as the Compassionate Use Act of 1996.[3] The proposition was designed to ensure that "seriously ill" residents of the State have access to marijuana for medical purposes, and to encourage Federal and State Governments to take steps towards ensuring the safe and affordable distribution of the drug to patients in need.[4] The Act creates an exemption from criminal prosecution for physicians,[5] as well as for

--------

[2] 1913 Cal. Stats. ch. 324, §8*a;* see also Gieringer, The Origins of Cannabis Prohibition in California, Contemporary Drug Problems, 21–23 (rev. 2005).

[3] Cal. Health & Safety Code Ann. §11362.5 (West Supp. 2005). The California Legislature recently enacted additional legislation supplementing the Compassionate Use Act. §§11362.7–11362.9 (West Supp. 2005).

[4] "The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:

"(A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

"(B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.

"(C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." §11362.5(b)(1) (West Supp. 2005).

[5] "Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having

patients and primary caregivers who possess or cultivate marijuana for medicinal purposes with the recommendation or approval of a physician.[6] A "primary caregiver" is a person who has consistently assumed responsibility for the housing, health, or safety of the patient.[7]

Respondents Angel Raich and Diane Monson are California residents who suffer from a variety of serious medical conditions and have sought to avail themselves of medical marijuana pursuant to the terms of the Compassionate Use Act. They are being treated by licensed, board-certified family practitioners, who have concluded, after prescribing a host of conventional medicines to treat respondents' conditions and to alleviate their associated symptoms, that marijuana is the only drug available that provides effective treatment. Both women have been using marijuana as a medication for several years pursuant to their doctors' recommendation, and both rely heavily on cannabis to function on a daily basis. Indeed, Raich's physician believes that forgoing cannabis treatments would certainly cause Raich excruciating pain and could very well prove fatal.

Respondent Monson cultivates her own marijuana, and ingests the drug in a variety of ways including smoking and using a vaporizer. Respondent Raich, by contrast, is unable to cultivate her own, and thus relies on two caregivers, litigating as "John Does," to provide her with locally grown marijuana at no charge. These caregivers also

_____

recommended marijuana to a patient for medical purposes." §11362.5(c) (West Supp. 2005).

[6] "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." §11362.5(d) (West Supp. 2005).

[7] §11362.5(e) (West Supp. 2005).

process the cannabis into hashish or keif, and Raich herself processes some of the marijuana into oils, balms, and foods for consumption.

On August 15, 2002, county deputy sheriffs and agents from the federal Drug Enforcement Administration (DEA) came to Monson's home. After a thorough investigation, the county officials concluded that her use of marijuana was entirely lawful as a matter of California law. Nevertheless, after a 3-hour standoff, the federal agents seized and destroyed all six of her cannabis plants.

Respondents thereafter brought this action against the Attorney General of the United States and the head of the DEA seeking injunctive and declaratory relief prohibiting the enforcement of the federal Controlled Substances Act (CSA), 84 Stat. 1242, 21 U. S. C. §801 *et seq.*, to the extent it prevents them from possessing, obtaining, or manufacturing cannabis for their personal medical use. In their complaint and supporting affidavits, Raich and Monson described the severity of their afflictions, their repeatedly futile attempts to obtain relief with conventional medications, and the opinions of their doctors concerning their need to use marijuana. Respondents claimed that enforcing the CSA against them would violate the Commerce Clause, the Due Process Clause of the Fifth Amendment, the Ninth and Tenth Amendments of the Constitution, and the doctrine of medical necessity.

The District Court denied respondents' motion for a preliminary injunction. *Raich* v. *Ashcroft,* 248 F. Supp. 2d 918 (ND Cal. 2003). Although the court found that the federal enforcement interests "wane[d]" when compared to the harm that California residents would suffer if denied access to medically necessary marijuana, it concluded that respondents could not demonstrate a likelihood of success on the merits of their legal claims. *Id.*, at 931.

A divided panel of the Court of Appeals for the Ninth Circuit reversed and ordered the District Court to enter a

preliminary injunction.[8] *Raich* v. *Ashcroft*, 352 F. 3d 1222 (2003). The court found that respondents had "demonstrated a strong likelihood of success on their claim that, as applied to them, the CSA is an unconstitutional exercise of Congress' Commerce Clause authority." *Id.,* at 1227. The Court of Appeals distinguished prior Circuit cases upholding the CSA in the face of Commerce Clause challenges by focusing on what it deemed to be the "*separate and distinct class of activities*" at issue in this case: "the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to valid California state law." *Id.*, at 1228. The court found the latter class of activities "different in kind from drug trafficking" because interposing a physician's recommendation raises different health and safety concerns, and because "this limited use is clearly distinct from the broader illicit drug market—as well as any broader commercial market for medicinal marijuana—insofar as the medicinal marijuana at issue in this case is not intended for, nor does it enter, the stream of commerce." *Ibid.*

The majority placed heavy reliance on our decisions in *United States* v. *Lopez,* 514 U. S. 549 (1995), and *United States* v. *Morrison,* 529 U. S. 598 (2000), as interpreted by recent Circuit precedent, to hold that this separate class of purely local activities was beyond the reach of federal power. In contrast, the dissenting judge concluded that

_____

[8] On remand, the District Court entered a preliminary injunction enjoining petitioners "'from arresting or prosecuting Plaintiffs Angel McClary Raich and Diane Monson, seizing their medical cannabis, forfeiting their property, or seeking civil or administrative sanctions against them with respect to the intrastate, non-commercial cultivation, possession, use, and obtaining without charge of cannabis for personal medical purposes on the advice of a physician and in accordance with state law, and which is not used for distribution, sale, or exchange.'" Brief for Petitioners 9.

the CSA, as applied to respondents, was clearly valid under *Lopez* and *Morrison;* moreover, he thought it "simply impossible to distinguish the relevant conduct surrounding the cultivation and use of the marijuana crop at issue in this case from the cultivation and use of the wheat crop that affected interstate commerce in *Wickard* v. *Filburn.*" 352 F. 3d, at 1235 (Beam, J., dissenting) (citation omitted).

The obvious importance of the case prompted our grant of certiorari. 542 U. S. 936 (2004). The case is made difficult by respondents' strong arguments that they will suffer irreparable harm because, despite a congressional finding to the contrary, marijuana does have valid therapeutic purposes. The question before us, however, is not whether it is wise to enforce the statute in these circumstances; rather, it is whether Congress' power to regulate interstate markets for medicinal substances encompasses the portions of those markets that are supplied with drugs produced and consumed locally. Well-settled law controls our answer. The CSA is a valid exercise of federal power, even as applied to the troubling facts of this case. We accordingly vacate the judgment of the Court of Appeals.

## II

Shortly after taking office in 1969, President Nixon declared a national "war on drugs."[9] As the first campaign of that war, Congress set out to enact legislation that would consolidate various drug laws on the books into a comprehensive statute, provide meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthen law enforcement tools against the traffic in illicit drugs.[10] That effort culminated

---

[9] See D. Musto & P. Korsmeyer, The Quest for Drug Control 60 (2002) (hereinafter Musto & Korsmeyer).

[10] H. R. Rep. No. 91–1444, pt. 2, p. 22 (1970) (hereinafter H. R. Rep.); 26 Congressional Quarterly Almanac 531 (1970) (hereinafter Almanac);

in the passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236.

This was not, however, Congress' first attempt to regulate the national market in drugs. Rather, as early as 1906 Congress enacted federal legislation imposing labeling regulations on medications and prohibiting the manufacture or shipment of any adulterated or misbranded drug traveling in interstate commerce.[11] Aside from these labeling restrictions, most domestic drug regulations prior to 1970 generally came in the guise of revenue laws, with the Department of the Treasury serving as the Federal Government's primary enforcer.[12] For example, the primary drug control law, before being repealed by the passage of the CSA, was the Harrison Narcotics Act of 1914, 38 Stat. 785 (repealed 1970). The Harrison Act sought to exert control over the possession and sale of narcotics, specifically cocaine and opiates, by requiring producers, distributors, and purchasers to register with the Federal Government, by assessing taxes against parties so registered, and by regulating the issuance of prescriptions.[13]

Marijuana itself was not significantly regulated by the Federal Government until 1937 when accounts of marijuana's addictive qualities and physiological effects, paired with dissatisfaction with enforcement efforts at state and local levels, prompted Congress to pass the Marihuana Tax Act, Pub. L. 75–238, 50 Stat. 551 (repealed 1970).[14]

————————

Musto & Korsmeyer 56–57.

[11] Pure Food and Drug Act of 1906, ch. 3915, 34 Stat. 768, repealed by Act of June 25, 1938, ch. 675, §902(a), 52 Stat. 1059.

[12] See *United States* v. *Doremus,* 249 U. S. 86 (1919); *Leary* v. *United States,* 395 U. S. 6, 14–16 (1969).

[13] See *Doremus*, 249 U. S., at 90–93.

[14] R. Bonnie & C. Whitebread, The Marijuana Conviction 154–174 (1999); L. Grinspoon & J. Bakalar, Marihuana, the Forbidden Medicine 7–8 (rev. ed. 1997) (hereinafter Grinspoon & Bakalar). Although this was the Federal Government's first attempt to regulate the marijuana trade, by this time all States had in place some form of legislation

Like the Harrison Act, the Marihuana Tax Act did not
outlaw the possession or sale of marijuana outright.
Rather, it imposed registration and reporting require-
ments for all individuals importing, producing, selling, or
dealing in marijuana, and required the payment of annual
taxes in addition to transfer taxes whenever the drug
changed hands.[15]  Moreover, doctors wishing to prescribe
marijuana for medical purposes were required to comply
with rather burdensome administrative requirements.[16]
Noncompliance exposed traffickers to severe federal penal-
ties, whereas compliance would often subject them to
prosecution under state law.[17]  Thus, while the Marihuana
Tax Act did not declare the drug illegal *per se*, the onerous
administrative requirements, the prohibitively expensive
taxes, and the risks attendant on compliance practically
curtailed the marijuana trade.

Then in 1970, after declaration of the national "war on
drugs," federal drug policy underwent a significant trans-
formation.  A number of noteworthy events precipitated
this policy shift.  First, in *Leary* v. *United States,* 395 U. S.
6 (1969), this Court held certain provisions of the Marihu-
ana Tax Act and other narcotics legislation unconstitu-
tional.  Second, at the end of his term, President Johnson
fundamentally reorganized the federal drug control agen-
cies.  The Bureau of Narcotics, then housed in the De-
partment of Treasury, merged with the Bureau of Drug
Abuse Control, then housed in the Department of Health,
Education, and Welfare (HEW), to create the Bureau of
Narcotics and Dangerous Drugs, currently housed in the
Department of Justice.[18]  Finally, prompted by a perceived

––––––––––

regulating the sale, use, or possession of marijuana.   R. Isralowitz,
Drug Use, Policy, and Management 134 (2d ed. 2002).
    [15] *Leary*, 395 U. S., at 14–16.
    [16] Grinspoon & Bakalar 8.
    [17] *Leary*, 395 U. S., at 16–18.
    [18] Musto & Korsmeyer 32–35; 26 Almanac 533.  In 1973, the Bureau

need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act.[19]

Title II of that Act, the CSA, repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs. The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances.[20]    Congress was particularly

———————

of Narcotics and Dangerous Drugs became the Drug Enforcement Administration (DEA).  See Reorg. Plan No. 2 of 1973, §1, 28 CFR §0.100 (1973).

[19] The Comprehensive Drug Abuse Prevention and Control Act of 1970 consists of three titles.  Title I relates to the prevention and treatment of narcotic addicts through HEW (now the Department of Health and Human Services).  84 Stat. 1238.  Title II, as discussed in more detail above, addresses drug control and enforcement as administered by the Attorney General and the DEA.  *Id.,* at 1242.  Title III concerns the import and export of controlled substances.  *Id.,* at 1285.

[20] In particular, Congress made the following findings:

"(1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

"(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

"(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce.  Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

"(A) after manufacture, many controlled substances are transported in interstate commerce,

"(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

"(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.[21]

To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. 21 U. S. C. §§841(a)(1), 844(a). The CSA categorizes all controlled substances into five schedules. §812. The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body. §§811, 812. Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein. §§821–830. The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping. *Ibid.* 21 CFR §1301 *et seq.* (2004).

In enacting the CSA, Congress classified marijuana as a Schedule I drug. 21 U. S. C. §812(c). This preliminary classification was based, in part, on the recommendation of the Assistant Secretary of HEW "that marihuana be retained within schedule I at least until the completion of

—————

"(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

"(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

"(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U. S. C. §§801(1)–(6).

[21] See *United States* v. *Moore,* 423 U. S. 122, 135 (1975); see also H. R. Rep., at 22.

certain studies now underway."[22]  Schedule I drugs are categorized as such because of their high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment.  §812(b)(1).  These three factors, in varying gradations, are also used to categorize drugs in the other four schedules.  For example, Schedule II substances also have a high potential for abuse which may lead to severe psychological or physical dependence, but unlike Schedule I drugs, they have a currently accepted medical use.  §812(b)(2).  By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study.  §§823(f), 841(a)(1), 844(a); see also *United States* v. *Oakland Cannabis Buyers' Cooperative,* 532 U. S. 483, 490 (2001).

The CSA provides for the periodic updating of schedules and delegates authority to the Attorney General, after consultation with the Secretary of Health and Human Services, to add, remove, or transfer substances to, from, or between schedules.  §811.  Despite considerable efforts to reschedule marijuana, it remains a Schedule I drug.[23]

—————

[22] H. R. Rep.*,* at 61 (quoting letter from Roger E. Egeberg, M. D. to Hon. Harley O. Staggers (Aug. 14, 1970)).

[23] Starting in 1972, the National Organization for the Reform of Marijuana Laws (NORML) began its campaign to reclassify marijuana. Grinspoon & Bakalar 13–17.  After some fleeting success in 1988 when an Administrative Law Judge (ALJ) declared that the DEA would be acting in an "unreasonable, arbitrary, and capricious" manner if it continued to deny marijuana access to seriously ill patients, and concluded that it should be reclassified as a Schedule III substance, *Grinspoon* v. *DEA*, 828 F. 2d 881, 883–884 (CA1 1987), the campaign has proved unsuccessful.  The DEA Administrator did not endorse the ALJ's findings, 54 Fed. Reg. 53767 (1989), and since that time has routinely denied petitions to reschedule the drug, most recently in

## III

Respondents in this case do not dispute that passage of the CSA, as part of the Comprehensive Drug Abuse Prevention and Control Act, was well within Congress' commerce power. Brief for Respondents 22, 38. Nor do they contend that any provision or section of the CSA amounts to an unconstitutional exercise of congressional authority. Rather, respondents' challenge is actually quite limited; they argue that the CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress' authority under the Commerce Clause.

In assessing the validity of congressional regulation, none of our Commerce Clause cases can be viewed in isolation. As charted in considerable detail in *United States* v. *Lopez*, our understanding of the reach of the Commerce Clause, as well as Congress' assertion of authority thereunder, has evolved over time.[24] The Commerce Clause emerged as the Framers' response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation.[25] For the first century of our history, the primary use of the Clause was to preclude the kind of discriminatory state legislation that had once been per-

———————

2001. 66 Fed. Reg. 20038 (2001). The Court of Appeals for the District of Columbia Circuit has reviewed the petition to reschedule marijuana on five separate occasions over the course of 30 years, ultimately upholding the Administrator's final order. See *Alliance for Cannabis Therapeutics* v. *DEA*, 15 F. 3d 1131, 1133 (1994).

[24] *United States* v. *Lopez*, 514 U. S. 549, 552–558 (1995); *id.,* at 568–574 (KENNEDY, J., concurring); *id.*, at 604–607 (SOUTER, J., dissenting).

[25] See *Gibbons* v. *Ogden,* 9 Wheat. 1, 224 (1824) (opinion of Johnson, J.); Stern, That Commerce Which Concerns More States Than One, 47 Harv. L. Rev. 1335, 1337, 1340–1341 (1934); G. Gunther, Constitutional Law 127 (9th ed. 1975).

missible.[26]  Then, in response to rapid industrial develop-
ment and an increasingly interdependent national econ-
omy, Congress "ushered in a new era of federal regulation
under the commerce power," beginning with the enact-
ment of the Interstate Commerce Act in 1887, 24 Stat.
379, and the Sherman Antitrust Act in 1890, 26 Stat. 209,
as amended, 15 U. S. C. §2 *et seq.*[27]

Cases decided during that "new era," which now spans
more than a century, have identified three general catego-
ries of regulation in which Congress is authorized to en-
gage under its commerce power.  First, Congress can
regulate the channels of interstate commerce.  *Perez* v.
*United States,* 402 U. S. 146, 150 (1971).  Second, Congress
has authority to regulate and protect the instrumentalities
of interstate commerce, and persons or things in interstate
commerce.  *Ibid.*  Third, Congress has the power to regu-
late activities that substantially affect interstate com-
merce.  *Ibid.; NLRB* v. *Jones & Laughlin Steel Corp.,* 301
U. S. 1, 37 (1937).  Only the third category is implicated in
the case at hand.

Our case law firmly establishes Congress' power to
regulate purely local activities that are part of an eco-
nomic "class of activities" that have a substantial effect on
interstate commerce.  See, *e.g., Perez,* 402 U. S., at 151;

———————

[26] See *Lopez,* 514 U. S., at 553–554; *id.,* at 568–569 (KENNEDY, J.,
concurring); see also *Granholm* v. *Heald*, 544 U. S. __, __ (2005) (slip
op., at 8–9).

[27] *Lopez,* 514 U. S., at 554; see also *Wickard* v. *Filburn*, 317 U. S.
111, 121 (1942) ("It was not until 1887, with the enactment of the
Interstate Commerce Act, that the interstate commerce power began
to exert positive influence in American law and life.  This first impor-
tant federal resort to the commerce power was followed in 1890 by the
Sherman Anti-Trust Act and, thereafter, mainly after 1903, by many
others.  These statutes ushered in new phases of adjudication, which
required the Court to approach the interpretation of the Commerce
Clause in the light of an actual exercise by Congress of its power
thereunder" (footnotes omitted)).

*Wickard* v. *Filburn*, 317 U. S. 111, 128–129 (1942). As we stated in *Wickard*, "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.*, at 125. We have never required Congress to legislate with scientific exactitude. When Congress decides that the "'total incidence'" of a practice poses a threat to a national market, it may regulate the entire class. See *Perez*, 402 U. S., at 154–155 (quoting *Westfall* v. *United States*, 274 U. S. 256, 259 (1927) ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so")). In this vein, we have reiterated that when "'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" *E.g., Lopez*, 514 U. S., at 558 (emphasis deleted) (quoting *Maryland* v. *Wirtz*, 392 U. S. 183, 196, n. 27 (1968)).

Our decision in *Wickard,* 317 U. S. 111, is of particular relevance. In *Wickard*, we upheld the application of regulations promulgated under the Agricultural Adjustment Act of 1938, 52 Stat. 31, which were designed to control the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and consequent abnormally low prices. The regulations established an allotment of 11.1 acres for Filburn's 1941 wheat crop, but he sowed 23 acres, intending to use the excess by consuming it on his own farm. Filburn argued that even though we had sustained Congress' power to regulate the production of goods for commerce, that power did not authorize "federal regulation [of] production not intended in any part for commerce but wholly for consumption on the farm." *Wickard,* 317 U. S., at 118. Justice Jackson's opinion for a unanimous Court rejected this submission. He wrote:

"The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.*, at 127–128.

*Wickard* thus establishes that Congress can regulate purely intrastate activity that is not itself "commercial," in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.

The similarities between this case and *Wickard* are striking. Like the farmer in *Wickard*, respondents are cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market.[28] Just as the Agricultural Adjustment Act was designed "to control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses . . ." and consequently control the market price, *id.*, at 115, a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets. See nn. 20–21, *supra*.

---

[28] Even respondents acknowledge the existence of an illicit market in marijuana; indeed, Raich has personally participated in that market, and Monson expresses a willingness to do so in the future. App. 59, 74, 87. See also *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S. 767, 770, 774, n. 12, and 780, n. 17 (1994) (discussing the "market value" of marijuana); *id.*, at 790 (REHNQUIST, C. J., dissenting); *id.*, at 792 (O'CONNOR, J., dissenting); *Whalen* v. *Roe*, 429 U. S. 589, 591 (1977) (addressing prescription drugs "for which there is both a lawful and an unlawful market"); *Turner* v. *United States*, 396 U. S. 398, 417, n. 33 (1970) (referring to the purchase of drugs on the "retail market").

In *Wickard*, we had no difficulty concluding that Congress had a rational basis for believing that, when viewed in the aggregate, leaving home-consumed wheat outside the regulatory scheme would have a substantial influence on price and market conditions. Here too, Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions.

More concretely, one concern prompting inclusion of wheat grown for home consumption in the 1938 Act was that rising market prices could draw such wheat into the interstate market, resulting in lower market prices. *Wickard*, 317 U. S., at 128. The parallel concern making it appropriate to include marijuana grown for home consumption in the CSA is the likelihood that the high demand in the interstate market will draw such marijuana into that market. While the diversion of homegrown wheat tended to frustrate the federal interest in stabilizing prices by regulating the volume of commercial transactions in the interstate market, the diversion of homegrown marijuana tends to frustrate the federal interest in eliminating commercial transactions in the interstate market in their entirety. In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity.[29]

---

[29] To be sure, the wheat market is a lawful market that Congress sought to protect and stabilize, whereas the marijuana market is an unlawful market that Congress sought to eradicate. This difference, however, is of no constitutional import. It has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity. *Lopez,* 514 U. S., at 571 (KENNEDY, J., concurring) ("In the *Lottery Case*, 188 U. S. 321 (1903), the Court rejected the argument that Congress lacked [the] power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit"); see also *Wickard*, 317 U. S., at 128 ("The

Nonetheless, respondents suggest that *Wickard* differs from this case in three respects: (1) the Agricultural Adjustment Act, unlike the CSA, exempted small farming operations; (2) *Wickard* involved a "quintessential economic activity"—a commercial farm—whereas respondents do not sell marijuana; and (3) the *Wickard* record made it clear that the aggregate production of wheat for use on farms had a significant impact on market prices. Those differences, though factually accurate, do not diminish the precedential force of this Court's reasoning.

The fact that Wickard's own impact on the market was "trivial by itself" was not a sufficient reason for removing him from the scope of federal regulation. 317 U. S., at 127. That the Secretary of Agriculture elected to exempt even smaller farms from regulation does not speak to his power to regulate all those whose aggregated production was significant, nor did that fact play any role in the Court's analysis. Moreover, even though Wickard was indeed a commercial farmer, the activity he was engaged in—the cultivation of wheat for home consumption—was not treated by the Court as part of his commercial farming operation.[30] And while it is true that the record in the *Wickard* case itself established the causal connection between the production for local use and the national market, we have before us findings by Congress to the same effect.

Findings in the introductory sections of the CSA explain why Congress deemed it appropriate to encompass local activities within the scope of the CSA. See n. 20, *supra.* The submissions of the parties and the numerous *amici* all seem to agree that the national, and international, market

———————

stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon").

[30] See *Wickard,* 317 U. S., at 125 (recognizing that Wickard's activity "may not be regarded as commerce").

for marijuana has dimensions that are fully comparable to those defining the class of activities regulated by the Secretary pursuant to the 1938 statute.[31]  Respondents nonetheless insist that the CSA cannot be constitutionally applied to their activities because Congress did not make a specific finding that the intrastate cultivation and possession of marijuana for medical purposes based on the recommendation of a physician would substantially affect the larger interstate marijuana market.  Be that as it may, we have never required Congress to make particularized findings in order to legislate, see *Lopez*, 514 U. S., at 562; *Perez*, 402 U. S., at 156, absent a special concern such as the protection of free speech, see, *e.g., Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 664–668 (1994) (plurality opinion).   While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly when the connection to commerce is not self-evident, and while we will consider congressional findings in our analysis when they are available, the absence of particularized findings does not call into question Congress' authority to legislate.[32]

––––––––

[31] The Executive Office of the President has estimated that in 2000 American users spent $10.5 *billion* on the purchase of marijuana.  Office of Nat. Drug Control Policy, Marijuana Fact Sheet 5 (Feb. 2004), available at http://www.whitehousedrugpolicy.gov/publications/factsht/marijuana/index .html (all Internet materials as visited June 2, 2005, and available in Clerk of Court's case file).

[32] Moreover, as discussed in more detail above, Congress did make findings regarding the effects of intrastate drug activity on interstate commerce.  See n. 20, *supra.*  Indeed, even the Court of Appeals found that those findings "weigh[ed] in favor" of upholding the constitutionality of the CSA.  352 F. 3d 1222, 1232 (CA9 2003) (case below).  The dissenters, however, would impose a new and heightened burden on Congress (unless the litigants can garner evidence sufficient to cure Congress' perceived "inadequa[cies]")—that legislation must contain detailed findings proving that each activity regulated within a comprehensive statute is essential to the statutory scheme.  *Post,* at 13–15 (O'CONNOR, J., dissenting); *post,* at 8 (THOMAS, J., dissenting).  Such an

In assessing the scope of Congress' authority under the Commerce Clause, we stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a "rational basis" exists for so concluding. *Lopez*, 514 U. S., at 557; see also *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 276–280 (1981); *Perez*, 402 U. S., at 155–156; *Katzenbach* v. *McClung*, 379 U. S. 294, 299–301 (1964); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 252–253 (1964). Given the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, 21 U. S. C. §801(5), and concerns about diversion into illicit channels,[33] we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA. Thus, as in *Wickard*, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce . . . among the several States." U. S. Const., Art. I, §8. That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual compo-

––––––––––

exacting requirement is not only unprecedented, it is also impractical. Indeed, the principal dissent's critique of Congress for "not even" including "declarations" specific to marijuana is particularly unpersuasive given that the CSA initially identified 80 other substances subject to regulation as Schedule I drugs, not to mention those categorized in Schedules II–V. *Post*, at 14 (O'CONNOR, J., dissenting). Surely, Congress cannot be expected (and certainly should not be required) to include specific findings on each and every substance contained therein in order to satisfy the dissenters' unfounded skepticism.

[33] See n. 21, *supra* (citing sources that evince Congress' particular concern with the diversion of drugs from legitimate to illicit channels).

nents of that larger scheme.

## IV

To support their contrary submission, respondents rely heavily on two of our more recent Commerce Clause cases. In their myopic focus, they overlook the larger context of modern-era Commerce Clause jurisprudence preserved by those cases. Moreover, even in the narrow prism of respondents' creation, they read those cases far too broadly.

Those two cases, of course, are *Lopez*, 514 U. S. 549, and *Morrison*, 529 U. S. 598. As an initial matter, the statutory challenges at issue in those cases were markedly different from the challenge respondents pursue in the case at hand. Here, respondents ask us to excise individual applications of a concededly valid statutory scheme. In contrast, in both *Lopez* and *Morrison*, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety. This distinction is pivotal for we have often reiterated that "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez,* 402 U. S., at 154 (emphasis deleted) (quoting *Wirtz*, 392 U. S., at 193); see also *Hodel,* 452 U. S., at 308.

At issue in *Lopez*, 514 U. S. 549, was the validity of the Gun-Free School Zones Act of 1990, which was a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone. 104 Stat. 4844–4845, 18 U. S. C. §922(q)(1)(A). The Act did not regulate any economic activity and did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity. Distinguishing our earlier cases holding that comprehensive regulatory statutes may be validly applied to local conduct that does not, when viewed in isolation, have a significant impact on interstate commerce, we held

the statute invalid. We explained:

> "Section 922(q) is a criminal statute that by its terms
> has nothing to do with 'commerce' or any sort of eco-
> nomic enterprise, however broadly one might define
> those terms. Section 922(q) is not an essential part of
> a larger regulation of economic activity, in which the
> regulatory scheme could be undercut unless the intra-
> state activity were regulated. It cannot, therefore, be
> sustained under our cases upholding regulations of
> activities that arise out of or are connected with a
> commercial transaction, which viewed in the aggre-
> gate, substantially affects interstate commerce." 514
> U. S., at 561.

The statutory scheme that the Government is defending
in this litigation is at the opposite end of the regulatory
spectrum. As explained above, the CSA, enacted in 1970
as part of the Comprehensive Drug Abuse Prevention and
Control Act, 84 Stat. 1242–1284, was a lengthy and de-
tailed statute creating a comprehensive framework for
regulating the production, distribution, and possession of
five classes of "controlled substances." Most of those
substances—those listed in Schedules II through V—"have
a useful and legitimate medical purpose and are necessary
to maintain the health and general welfare of the Ameri-
can people." 21 U. S. C. §801(1). The regulatory scheme
is designed to foster the beneficial use of those medica-
tions, to prevent their misuse, and to prohibit entirely the
possession or use of substances listed in Schedule I, except
as a part of a strictly controlled research project.

While the statute provided for the periodic updating of
the five schedules, Congress itself made the initial classifi-
cations. It identified 42 opiates, 22 opium derivatives, and
17 hallucinogenic substances as Schedule I drugs. 84 Stat.
1248. Marijuana was listed as the 10th item in the third
subcategory. That classification, unlike the discrete pro-

hibition established by the Gun-Free School Zones Act of 1990, was merely one of many "essential part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U. S., at 561.[34] Our opinion in *Lopez* casts no doubt on the validity of such a program.

Nor does this Court's holding in *Morrison*, 529 U. S. 598. The Violence Against Women Act of 1994, 108 Stat. 1902, created a federal civil remedy for the victims of gender-motivated crimes of violence. 42 U. S. C. §13981. The remedy was enforceable in both state and federal courts, and generally depended on proof of the violation of a state law. Despite congressional findings that such crimes had an adverse impact on interstate commerce, we held the statute unconstitutional because, like the statute in *Lopez*, it did not regulate economic activity. We concluded that "the noneconomic, criminal nature of the conduct at issue was central to our decision" in *Lopez*, and that our prior cases had identified a clear pattern of analysis: "'Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.'"[35] *Morrison*, 529 U. S., at 610.

Unlike those at issue in *Lopez* and *Morrison*, the activi-

---

[34] The principal dissent asserts that by "[s]eizing upon our language in *Lopez*," *post*, at 5 (opinion of O'CONNOR, J.), *i.e.,* giving effect to our well-established case law, Congress will now have an incentive to legislate broadly. Even putting aside the political checks that would generally curb Congress' power to enact a broad and comprehensive scheme for the purpose of targeting purely local activity, there is no suggestion that the CSA constitutes the type of "evasive" legislation the dissent fears, nor could such an argument plausibly be made. *Post*, at 6 (O'CONNOR, J., dissenting).

[35] *Lopez,* 514 U. S., at 560; see also *id.*, at 573–574 (KENNEDY, J., concurring) (stating that *Lopez* did not alter our "practical conception of commercial regulation" and that Congress may "regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy").

ties regulated by the CSA are quintessentially economic. "Economics" refers to "the production, distribution, and consumption of commodities." Webster's Third New International Dictionary 720 (1966). The CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market. Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product.[36] Such prohibitions include specific decisions requiring that a drug be withdrawn from the market as a result of the failure to comply with regulatory requirements as well as decisions excluding Schedule I drugs entirely from the market. Because the CSA is a statute that directly regulates economic, commercial activity, our opinion in *Morrison* casts no doubt on its constitutionality.

The Court of Appeals was able to conclude otherwise only by isolating a "separate and distinct" class of activities that it held to be beyond the reach of federal power, defined as "the intrastate, noncommercial cultivation, possession and use of marijuana for personal medical purposes on the advice of a physician and in accordance with state law." 352 F. 3d, at 1229. The court characterized this class as "different in kind from drug trafficking." *Id.,* at 1228. The differences between the members of a class so defined and the principal traffickers in Schedule I substances might be sufficient to justify a policy decision exempting the narrower class from the coverage of the CSA. The question, however, is whether Congress' contrary policy judgment, *i.e.*, its decision to include this narrower "class of activities" within the larger regulatory

————————
[36] See 16 U. S. C. §668(a) (bald and golden eagles); 18 U. S. C. §175(a) (biological weapons); §831(a) (nuclear material); §842(n)(1) (certain plastic explosives); §2342(a) (contraband cigarettes).

scheme, was constitutionally deficient. We have no diffi-
culty concluding that Congress acted rationally in deter-
mining that none of the characteristics making up the
purported class, whether viewed individually or in the
aggregate, compelled an exemption from the CSA; rather,
the subdivided class of activities defined by the Court of
Appeals was an essential part of the larger regulatory
scheme.

First, the fact that marijuana is used "for personal
medical purposes on the advice of a physician" cannot
itself serve as a distinguishing factor. 352 F. 3d, at 1229.
The CSA designates marijuana as contraband for *any*
purpose; in fact, by characterizing marijuana as a Sched-
ule I drug, Congress expressly found that the drug has no
acceptable medical uses. Moreover, the CSA is a compre-
hensive regulatory regime specifically designed to regulate
which controlled substances can be utilized for medicinal
purposes, and in what manner. Indeed, most of the sub-
stances classified in the CSA "have a useful and legitimate
medical purpose." 21 U. S. C. §801(1). Thus, even if
respondents are correct that marijuana does have ac-
cepted medical uses and thus should be redesignated as a
lesser schedule drug,[37] the CSA would still impose controls

––––––––––

[37] We acknowledge that evidence proffered by respondents in this case
regarding the effective medical uses for marijuana, if found credible
after trial, would cast serious doubt on the accuracy of the findings that
require marijuana to be listed in Schedule I. See, *e.g.,* Institute of
Medicine, Marijuana and Medicine: Assessing the Science Base 179 (J.
Joy, S. Watson, & J. Benson eds. 1999) (recognizing that "[s]cientific
data indicate the potential therapeutic value of cannabinoid drugs,
primarily THC [Tetrahydrocannabinol] for pain relief, control of nausea
and vomiting, and appetite stimulation"); see also *Conant* v. *Walters*,
309 F. 3d 629, 640–643 (CA9 2002) (Kozinski, J., concurring) (chroni-
cling medical studies recognizing valid medical uses for marijuana and
its derivatives). But the possibility that the drug may be reclassified in
the future has no relevance to the question whether Congress now has
the power to regulate its production and distribution. Respondents'

beyond what is required by California law. The CSA requires manufacturers, physicians, pharmacies, and other handlers of controlled substances to comply with statutory and regulatory provisions mandating registration with the DEA, compliance with specific production quotas, security controls to guard against diversion, recordkeeping and reporting obligations, and prescription requirements. See 21 U. S. C. §§821–830; 21 CFR §1301 *et seq.* (2004). Furthermore, the dispensing of new drugs, even when doctors approve their use, must await federal approval. *United States* v. *Rutherford*, 442 U. S. 544 (1979). Accordingly, the mere fact that marijuana—like virtually every other controlled substance regulated by the CSA—is used for medicinal purposes cannot possibly serve to distinguish it from the core activities regulated by the CSA.

Nor can it serve as an "objective marke[r]" or "objective facto[r]" to arbitrarily narrow the relevant class as the dissenters suggest, *post*, at 6 (O'CONNOR, J., dissenting); *post*, at 12 (THOMAS, J., dissenting). More fundamentally, if, as the principal dissent contends, the personal cultivation, possession, and use of marijuana for medicinal purposes is beyond the " 'outer limits' of Congress' Commerce Clause authority," *post*, at 1 (O'CONNOR, J., dissenting), it must also be true that such personal use of marijuana (or any other homegrown drug) for recreational purposes is also beyond those " 'outer limits,' " whether or not a State elects to authorize or even regulate such use. JUSTICE THOMAS' separate dissent suffers from the same sweeping implications. That is, the dissenters' rationale logically extends to place *any* federal regulation (including quality, prescription, or quantity controls) of *any* locally cultivated and possessed controlled substance for *any* purpose be-

submission, if accepted, would place all homegrown medical substances beyond the reach of Congress' regulatory jurisdiction.

yond the " 'outer limits' " of Congress' Commerce Clause authority. One need not have a degree in economics to understand why a nationwide exemption for the vast quantity of marijuana (or other drugs) locally cultivated for personal use (which presumably would include use by friends, neighbors, and family members) may have a substantial impact on the interstate market for this extraordinarily popular substance. The congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity. Indeed, that judgment is not only rational, but "visible to the naked eye," *Lopez*, 514 U. S., at 563, under any commonsense appraisal of the probable consequences of such an open-ended exemption.

Second, limiting the activity to marijuana possession and cultivation "in accordance with state law" cannot serve to place respondents' activities beyond congressional reach. The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail. It is beyond peradventure that federal power over commerce is " 'superior to that of the States to provide for the welfare or necessities of their inhabitants,' " however legitimate or dire those necessities may be. *Wirtz*, 392 U. S., at 196 (quoting *Sanitary Dist. of Chicago* v. *United States*, 266 U. S. 405, 426 (1925)). See also 392 U. S., at 195–196; *Wickard*, 317 U. S., at 124 (" '[N]o form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress' "). Just as state acquiescence to federal regulation cannot expand the bounds of the Commerce Clause, see, *e.g.*, *Morrison*, 529 U. S., at 661–662 (BREYER, J., dissenting) (noting that 38 States requested federal intervention), so too state action cannot circumscribe Congress' plenary commerce power. See *United States* v. *Darby*, 312 U. S. 100, 114 (1941) ("That power can neither be enlarged

nor diminished by the exercise or non-exercise of state power").[38]

Respondents acknowledge this proposition, but nonetheless contend that their activities were not "an essential part of a larger regulatory scheme" because they had been "isolated by the State of California, and [are] policed by the State of California," and thus remain "entirely separated from the market." Tr. of Oral Arg. 27. The dissenters fall prey to similar reasoning. See n. 38, *supra* this page. The notion that California law has surgically ex-

———————

[38] That is so even if California's current controls (enacted eight years after the Compassionate Use Act was passed) are "[e]ffective," as the dissenters would have us blindly presume, *post*, at 15 (O'CONNOR, J., dissenting); *post*, at 6, 12 (THOMAS, J., dissenting). California's decision (made 34 years after the CSA was enacted) to impose "stric[t] controls" on the "cultivation and possession of marijuana for medical purposes," *post*, at 6 (THOMAS, J., dissenting), cannot retroactively divest Congress of its authority under the Commerce Clause. Indeed, JUSTICE THOMAS' urgings to the contrary would turn the Supremacy Clause on its head, and would resurrect limits on congressional power that have long since been rejected. See *post*, at 8 (SCALIA, J., concurring in judgment) (quoting *McCulloch* v. *Maryland,* 4 Wheat. 316, 424 (1819)) ("'To impose on [Congress] the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution'").

Moreover, in addition to casting aside more than a century of this Court's Commerce Clause jurisprudence, it is noteworthy that JUSTICE THOMAS' suggestion that States possess the power to dictate the extent of Congress' commerce power would have far-reaching implications beyond the facts of this case. For example, under his reasoning, Congress would be equally powerless to regulate, let alone prohibit, the intrastate possession, cultivation, and use of marijuana for *recreational* purposes, an activity which all States "strictly contro[l]." Indeed, his rationale seemingly would require Congress to cede its constitutional power to regulate commerce whenever a State opts to exercise its "traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens." *Post*, at 9–10 (dissenting opinion).

cised a discrete activity that is hermetically sealed off
from the larger interstate marijuana market is a dubious
proposition, and, more importantly, one that Congress
could have rationally rejected.

Indeed, that the California exemptions will have a sig-
nificant impact on both the supply and demand sides of
the market for marijuana is not just "plausible" as the
principal dissent concedes, *post*, at 16 (O'CONNOR, J.,
dissenting), it is readily apparent. The exemption for
physicians provides them with an economic incentive to
grant their patients permission to use the drug. In contrast
to most prescriptions for legal drugs, which limit the dosage
and duration of the usage, under California law the doctor's
permission to recommend marijuana use is open-ended.
The authority to grant permission whenever the doctor
determines that a patient is afflicted with "any other illness
for which marijuana provides relief," Cal. Health & Safety
Code Ann. §11362.5(b)(1)(A) (West Supp. 2005), is broad
enough to allow even the most scrupulous doctor to conclude
that some recreational uses would be therapeutic.[39] And
our cases have taught us that there are some unscrupulous
physicians who overprescribe when it is sufficiently profit-
able to do so.[40]

The exemption for cultivation by patients and caregivers
can only increase the supply of marijuana in the California
market.[41] The likelihood that all such production will

_____

[39] California's Compassionate Use Act has since been amended, limit-
ing the catchall category to "[a]ny other chronic or persistent medical
symptom that either: . . . [s]ubstantially limits the ability of the person
to conduct one or more major life activities as defined" in the Americans
with Disabilities Act of 1990, or "[i]f not alleviated, may cause serious
harm to the patient's safety or physical or mental health." Cal. Health
& Safety Code Ann. §§11362.7(h)(12)(A) to (12)(B) (West Supp. 2005).

[40] See, *e.g., United States* v. *Moore,* 423 U. S. 122 (1975); *United States*
v. *Doremus*, 249 U. S. 86 (1919).

[41] The state policy allows patients to possess up to eight ounces of

promptly terminate when patients recover or will precisely match the patients' medical needs during their convalescence seems remote; whereas the danger that excesses will satisfy some of the admittedly enormous demand for recreational use seems obvious.[42]  Moreover, that the national and international narcotics trade has thrived in the face of vigorous criminal enforcement efforts suggests that no small number of unscrupulous people will make use of the California exemptions to serve their commercial ends whenever it is feasible to do so.[43]  Taking into account the fact that

—————

dried marijuana, and to cultivate up to 6 mature or 12 immature plants.  Cal. Health & Safety Code Ann. §11362.77(a) (West Supp. 2005).  However, the quantity limitations serve only as a floor.  Based on a doctor's recommendation, a patient can possess whatever quantity is necessary to satisfy his medical needs, and cities and counties are given *carte blanche* to establish more generous limits.  Indeed, several cities and counties have done just that.  For example, patients residing in the cities of Oakland and Santa Cruz and in the counties of Sonoma and Tehama are permitted to possess up to 3 pounds of processed marijuana.  Reply Brief for United States 19 (citing Proposition 215 Enforcement Guidelines).  Putting that quantity in perspective, 3 pounds of marijuana yields roughly 3,000 joints or cigarettes.  Executive Office of the President, Office of National Drug Control Policy, What America's Users Spend on Illegal Drugs 24 (Dec. 2001), http://www.whitehousedrugpolicy.gov/publications/pdf/american_users_ spend_2002.pdf.  And the street price for that amount can range anywhere from $900 to $24,000.  DEA, Illegal Drug Price and Purity Report (Apr. 2003) (DEA–02058).

[42] For example, respondent Raich attests that she uses 2.5 ounces of cannabis a week.  App. 82.  Yet as a resident of Oakland, she is entitled to possess up to 3 pounds of processed marijuana at any given time, nearly 20 times more than she uses on a weekly basis.

[43] See, *e.g., People ex rel. Lungren* v. *Peron*, 59 Cal. App. 4th 1383, 1386–1387 (1997) (recounting how a Cannabis Buyers' Club engaged in an "indiscriminate and uncontrolled pattern of sale to thousands of persons among the general public, including persons who had not demonstrated any recommendation or approval of a physician and, in fact, some of whom were not under the care of a physician, such as undercover officers," and noting that "some persons who had purchased marijuana on respondents' premises were reselling it unlawfully on the

California is only one of at least nine States to have authorized the medical use of marijuana, a fact JUSTICE O'CONNOR's dissent conveniently disregards in arguing that the demonstrated effect on commerce while admittedly "plausible" is ultimately "unsubstantiated," *post,* at 14, 16, Congress could have rationally concluded that the aggregate impact on the national market of all the transactions exempted from federal supervision is unquestionably substantial.

So, from the "separate and distinct" class of activities identified by the Court of Appeals (and adopted by the dissenters), we are left with "the intrastate, noncommercial cultivation, possession and use of marijuana." 352 F. 3d, at 1229. Thus the case for the exemption comes down to the claim that a locally cultivated product that is used domestically rather than sold on the open market is not subject to federal regulation. Given the findings in the CSA and the undisputed magnitude of the commercial market for marijuana, our decisions in *Wickard* v. *Filburn* and the later cases endorsing its reasoning foreclose that claim.

V

Respondents also raise a substantive due process claim and seek to avail themselves of the medical necessity defense. These theories of relief were set forth in their complaint but were not reached by the Court of Appeals. We therefore do not address the question whether judicial relief is available to respondents on these alternative bases. We do note, however, the presence of another avenue of relief. As the Solicitor General confirmed during oral argument, the statute authorizes procedures for the reclassification of Schedule I drugs. But perhaps even more important than these legal avenues is the democratic

––––––––––

street").

process, in which the voices of voters allied with these respondents may one day be heard in the halls of Congress. Under the present state of the law, however, the judgment of the Court of Appeals must be vacated. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 03–1454

———————

## ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* ANGEL MCCLARY RAICH ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 6, 2005]

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court's holding that the Controlled Substances Act (CSA) may validly be applied to respondents' cultivation, distribution, and possession of marijuana for personal, medicinal use. I write separately because my understanding of the doctrinal foundation on which that holding rests is, if not inconsistent with that of the Court, at least more nuanced.

Since *Perez* v. *United States,* 402 U. S. 146 (1971), our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. *Id.,* at 150; see *United States* v. *Morrison*, 529 U. S. 598, 608–609 (2000); *United States* v. *Lopez*, 514 U. S. 549, 558–559 (1995); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 276–277 (1981). The first two categories are self-evident, since they are the ingredients of interstate commerce itself. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 189–190 (1824). The third category, however, is different in kind, and its recitation without explanation is misleading and incomplete.

It is *misleading* because, unlike the channels, instru-

mentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone. Rather, as this Court has acknowledged since at least *United States* v. *Coombs,* 12 Pet. 72 (1838), Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause. *Id.,* at 78; *Katzenbach* v. *McClung*, 379 U. S. 294, 301–302 (1964); *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 119 (1942); *Shreveport Rate Cases,* 234 U. S. 342, 353 (1914); *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 39–40 (1895) (Harlan, J., dissenting).[1] And the category of "activities that substantially affect interstate commerce," *Lopez*, *supra*, at 559, is *incomplete* because the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws governing intrastate activities that substantially affect interstate commerce. Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce.

I

Our cases show that the regulation of intrastate activities may be necessary to and proper for the regulation of interstate commerce in two general circumstances. Most directly, the commerce power permits Congress not only to devise rules for the governance of commerce between

_____

[1] See also *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 584–585 (1985) (O'CONNOR, J., dissenting) (explaining that it is through the Necessary and Proper Clause that "an intrastate activity 'affecting' interstate commerce can be reached through the commerce power").

States but also to facilitate interstate commerce by eliminating potential obstructions, and to restrict it by eliminating potential stimulants. See *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 36–37 (1937). That is why the Court has repeatedly sustained congressional legislation on the ground that the regulated activities had a substantial effect on interstate commerce. See, *e.g.*, *Hodel, supra*, at 281 (surface coal mining); *Katzenbach*, *supra*, at 300 (discrimination by restaurants); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 258 (1964) (discrimination by hotels); *Mandeville Island Farms* v. *American Crystal Sugar Co.*, 334 U. S. 219, 237 (1948) (intrastate price-fixing); *Board of Trade of Chicago* v. *Olsen,* 262 U. S. 1, 40 (1923) (activities of a local grain exchange); *Stafford* v. *Wallace,* 258 U. S. 495, 517, 524–525 (1922) (intrastate transactions at stockyard). *Lopez* and *Morrison* recognized the expansive scope of Congress's authority in this regard: "[T]he pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez, supra*, at 560; *Morrison*, *supra*, at 610 (same).

This principle is not without limitation. In *Lopez* and *Morrison*, the Court—conscious of the potential of the "substantially affects" test to "'obliterate the distinction between what is national and what is local,'" *Lopez*, *supra*, at 566–567 (quoting *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 554 (1935)); see also *Morrison*, *supra*, at 615–616—rejected the argument that Congress may regulate *noneconomic* activity based solely on the effect that it may have on interstate commerce through a remote chain of inferences. *Lopez, supra*, at 564–566; *Morrison*, *supra*, at 617–618. "[I]f we were to accept [such] arguments," the Court reasoned in *Lopez*, "we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Lopez, supra*, at 564; see also *Morrison*, *supra*, at 615–616. Thus, although

Congress's authority to regulate intrastate activity that substantially affects interstate commerce is broad, it does not permit the Court to "pile inference upon inference," *Lopez*, *supra*, at 567, in order to establish that noneconomic activity has a substantial effect on interstate commerce.

As we implicitly acknowledged in *Lopez*, however, Congress's authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws directed against economic activities that have a substantial effect on interstate commerce. Though the conduct in *Lopez* was not economic, the Court nevertheless recognized that it could be regulated as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U. S., at 561. This statement referred to those cases permitting the regulation of intrastate activities "which in a substantial way interfere with or obstruct the exercise of the granted power." *Wrightwood Dairy Co.*, 315 U. S., at 119; see also *United States* v. *Darby*, 312 U. S. 100, 118–119 (1941); *Shreveport Rate Cases*, 234 U. S., at 353. As the Court put it in *Wrightwood Dairy*, where Congress has the authority to enact a regulation of interstate commerce, "it possesses every power needed to make that regulation effective." 315 U. S., at 118–119.

Although this power "to make . . . regulation effective" commonly overlaps with the authority to regulate economic activities that substantially affect interstate commerce,[2] and may in some cases have been confused with

———————

[2] *Wickard* v. *Filburn*, 317 U. S. 111 (1942), presented such a case. Because the unregulated production of wheat for personal consumption diminished demand in the regulated wheat market, the Court said, it carried with it the potential to disrupt Congress's price regulation by driving down prices in the market. *Id.*, at 127–129. This potential disruption of Congress's interstate regulation, and not only the effect

that authority, the two are distinct. The regulation of an intrastate activity may be essential to a comprehensive regulation of interstate commerce even though the intrastate activity does not itself "substantially affect" interstate commerce. Moreover, as the passage from *Lopez* quoted above suggests, Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce. See *Lopez*, *supra*, at 561. The relevant question is simply whether the means chosen are "reasonably adapted" to the attainment of a legitimate end under the commerce power. See *Darby*, *supra*, at 121.

In *Darby*, for instance, the Court explained that "Congress, having . . . adopted the policy of excluding from interstate commerce all goods produced for the commerce which do not conform to the specified labor standards," 312 U. S., at 121, could not only require employers engaged in the production of goods for interstate commerce to conform to wage and hour standards, *id.*, at 119–121, but could also require those employers to keep employment records in order to demonstrate compliance with the regulatory scheme, *id.*, at 125. While the Court sustained the former regulation on the alternative ground that the activity it regulated could have a "great effect" on interstate commerce, *id.*, at 122–123, it affirmed the latter on the sole ground that "[t]he requirement for records even of the intrastate transaction is an appropriate means to a legitimate end," *id.*, at 125.

As the Court said in the *Shreveport Rate Cases*, the Necessary and Proper Clause does not give "Congress . . . the authority to regulate the internal commerce of a State, as such," but it does allow Congress "to take all measures necessary or appropriate to" the effective regulation of the

_____

that personal consumption of wheat had on interstate commerce, justified Congress's regulation of that conduct. *Id.*, at 128–129.

interstate market, "although intrastate transactions . . . may thereby be controlled." 234 U. S., at 353; see also *Jones & Laughlin Steel Corp.*, 301 U. S., at 38 (the logic of the *Shreveport Rate Cases* is not limited to instrumentalities of commerce).

## II

Today's principal dissent objects that, by permitting Congress to regulate activities necessary to effective interstate regulation, the Court reduces *Lopez* and *Morrison* to "little more than a drafting guide." *Post*, at 5 (opinion of O'Connor, J.). I think that criticism unjustified. Unlike the power to regulate activities that have a substantial effect on interstate commerce, the power to enact laws enabling effective regulation of interstate commerce can only be exercised in conjunction with congressional regulation of an interstate market, and it extends only to those measures necessary to make the interstate regulation effective. As *Lopez* itself states, and the Court affirms today, Congress may regulate noneconomic intrastate activities only where the failure to do so "could . . . undercut" its regulation of interstate commerce. See *Lopez*, *supra*, at 561; *ante*, at 15, 21, 22. This is not a power that threatens to obliterate the line between "what is truly national and what is truly local." *Lopez*, *supra*, at 567–568.

*Lopez* and *Morrison* affirm that Congress may not regulate certain "purely local" activity within the States based solely on the attenuated effect that such activity may have in the interstate market. But those decisions do not declare noneconomic intrastate activities to be categorically beyond the reach of the Federal Government. Neither case involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such a case, 514 U. S., at 561, and *Morrison* did not

even discuss the possibility that it was. (The Court of Appeals in *Morrison* made clear that it was not. See *Brzonkala* v. *Virginia Polytechnic Inst.*, 169 F. 3d 820, 834–835 (CA4 1999) (en banc).) To dismiss this distinction as "superficial and formalistic," see *post*, at 6 (O'CONNOR, J., dissenting), is to misunderstand the nature of the Necessary and Proper Clause, which empowers Congress to enact laws in effectuation of its enumerated powers that are not within its authority to enact in isolation. See *McCulloch* v. *Maryland*, 4 Wheat. 316, 421–422 (1819).

And there are other restraints upon the Necessary and Proper Clause authority. As Chief Justice Marshall wrote in *McCulloch* v. *Maryland*, even when the end is constitutional and legitimate, the means must be "appropriate" and "plainly adapted" to that end. *Id.*, at 421. Moreover, they may not be otherwise "prohibited" and must be "consistent with the letter and spirit of the constitution." *Ibid.* These phrases are not merely hortatory. For example, cases such as *Printz* v. *United States*, 521 U. S. 898 (1997), and *New York* v. *United States*, 505 U. S. 144 (1992), affirm that a law is not "'*proper* for carrying into Execution the Commerce Clause'" "[w]hen [it] violates [a constitutional] principle of state sovereignty." *Printz, supra*, at 923–924; see also *New York, supra*, at 166.

## III

The application of these principles to the case before us is straightforward. In the CSA, Congress has undertaken to extinguish the interstate market in Schedule I controlled substances, including marijuana. The Commerce Clause unquestionably permits this. The power to regulate interstate commerce "extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it." *Darby*, 312 U. S., at 113. See also *Hipolite Egg Co.* v. *United States,* 220 U. S. 45, 58 (1911); *Lottery Case,* 188 U. S. 321, 354 (1903). To

effectuate its objective, Congress has prohibited almost all intrastate activities related to Schedule I substances—both economic activities (manufacture, distribution, possession with the intent to distribute) and noneconomic activities (simple possession). See 21 U. S. C. §§841(a), 844(a). That simple possession is a noneconomic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation. Rather, Congress's authority to enact all of these prohibitions of intrastate controlled-substance activities depends only upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from interstate commerce.

By this measure, I think the regulation must be sustained. Not only is it impossible to distinguish "controlled substances manufactured and distributed intrastate" from "controlled substances manufactured and distributed interstate," but it hardly makes sense to speak in such terms. Drugs like marijuana are fungible commodities. As the Court explains, marijuana that is grown at home and possessed for personal use is never more than an instant from the interstate market—and this is so whether or not the possession is for medicinal use or lawful use under the laws of a particular State.[3] See *ante*, at

_____

[3] The principal dissent claims that, if this is sufficient to sustain the regulation at issue in this case, then it should also have been sufficient to sustain the regulation at issue in *United States* v. *Lopez*, 514 U. S. 549 (1995). See *post*, at 11–12 (arguing that "we could have surmised in *Lopez* that guns in school zones are 'never more than an instant from the interstate market' in guns already subject to federal regulation, recast *Lopez* as a Necessary and Proper Clause case, and thereby upheld the Gun-Free School Zones Act"). This claim founders upon the shoals of *Lopez* itself, which made clear that the statute there at issue was "*not* an essential part of a larger regulation of economic activity." *Lopez*, *supra*, at 561 (emphasis added). On the dissent's view of things, that statement is inexplicable. Of course it is in addition difficult to imagine what intelligible scheme of regulation of the interstate market

23–30. Congress need not accept on faith that state law will be effective in maintaining a strict division between a lawful market for "medical" marijuana and the more general marijuana market. See *id.*, at 26–27, and n. 38. "To impose on [Congress] the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution." *McCulloch*, *supra*, at 424.

Finally, neither respondents nor the dissenters suggest any violation of state sovereignty of the sort that would render this regulation "inappropriate," *id.*, at 421—except to argue that the CSA regulates an area typically left to state regulation. See *post*, at 6–7, 11 (opinion of O'CONNOR, J.); *post*, at 8–9 (opinion of THOMAS, J.); Brief for Respondents 39–42. That is not enough to render federal regulation an inappropriate means. The Court has repeatedly recognized that, if authorized by the commerce power, Congress may regulate private endeavors "even when [that regulation] may pre-empt express state-law determinations contrary to the result which has commended itself to the collective wisdom of Congress." *National League of Cities* v. *Usery*, 426 U. S. 833, 840 (1976); see *Cleveland* v. *United States*, 329 U. S. 14, 19 (1946);

––––––––––

in guns could have as an appropriate means of effectuation the prohibition of guns within 1000 feet of schools (and nowhere else). The dissent points to a federal law, 18 U. S. C. §922(b)(1), barring licensed dealers from selling guns to minors, see *post*, at 12, but the relationship between the regulatory scheme of which §922(b)(1) is a part (requiring all dealers in firearms that have traveled in interstate commerce to be licensed, see §922(a)) and the statute at issue in *Lopez* approaches the nonexistent—which is doubtless why the Government did not attempt to justify the statute on the basis of that relationship.

*McCulloch, supra*, at 424. At bottom, respondents' state-sovereignty argument reduces to the contention that federal regulation of the activities permitted by California's Compassionate Use Act is not sufficiently necessary to be "necessary and proper" to Congress's regulation of the interstate market. For the reasons given above and in the Court's opinion, I cannot agree.

\*  \*  \*

I thus agree with the Court that, however the class of regulated activities is subdivided, Congress could reasonably conclude that its objective of prohibiting marijuana from the interstate market "could be undercut" if those activities were excepted from its general scheme of regulation. See *Lopez*, 514 U. S., at 561. That is sufficient to authorize the application of the CSA to respondents.

# SUPREME COURT OF THE UNITED STATES

_____

No. 03–1454

_____

ALBERTO R. GONZALES, ATTORNEY GENERAL, ET
AL., PETITIONERS *v.* ANGEL MCCLARY RAICH ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 6, 2005]

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and
JUSTICE THOMAS join as to all but Part III, dissenting.

We enforce the "outer limits" of Congress' Commerce
Clause authority not for their own sake, but to protect
historic spheres of state sovereignty from excessive federal
encroachment and thereby to maintain the distribution of
power fundamental to our federalist system of govern-
ment. *United States* v. *Lopez*, 514 U. S. 549, 557 (1995);
*NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 37
(1937). One of federalism's chief virtues, of course, is that
it promotes innovation by allowing for the possibility that
"a single courageous State may, if its citizens choose, serve
as a laboratory; and try novel social and economic experi-
ments without risk to the rest of the country." *New State
Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis,
J., dissenting).

This case exemplifies the role of States as laboratories.
The States' core police powers have always included au-
thority to define criminal law and to protect the health,
safety, and welfare of their citizens. *Brecht* v. *Abraham-
son*, 507 U. S. 619, 635 (1993); *Whalen* v. *Roe*, 429 U. S.
589, 603, n. 30 (1977). Exercising those powers, California
(by ballot initiative and then by legislative codification)
has come to its own conclusion about the difficult and
sensitive question of whether marijuana should be avail-

able to relieve severe pain and suffering. Today the Court sanctions an application of the federal Controlled Substances Act that extinguishes that experiment, without any proof that the personal cultivation, possession, and use of marijuana for medicinal purposes, if economic activity in the first place, has a substantial effect on interstate commerce and is therefore an appropriate subject of federal regulation. In so doing, the Court announces a rule that gives Congress a perverse incentive to legislate broadly pursuant to the Commerce Clause—nestling questionable assertions of its authority into comprehensive regulatory schemes—rather than with precision. That rule and the result it produces in this case are irreconcilable with our decisions in *Lopez, supra*, and *United States* v. *Morrison*, 529 U. S. 598 (2000). Accordingly I dissent.

I

In *Lopez*, we considered the constitutionality of the Gun-Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm . . . at a place the individual knows, or has reasonable cause to believe, is a school zone," 18 U. S. C. §922(q)(2)(A). We explained that "Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce . . . , *i.e.*, those activities that substantially affect interstate commerce." 514 U. S., at 558–559 (citation omitted). This power derives from the conjunction of the Commerce Clause and the Necessary and Proper Clause. *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 585–586 (1985) (O'CONNOR, J., dissenting) (explaining that *United States* v. *Darby*, 312 U. S. 100 (1941), *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110 (1942), and *Wickard* v. *Filburn*, 317 U. S. 111 (1942), based their expansion of the commerce power on the Nec-

essary and Proper Clause, and that "the reasoning of these cases underlies every recent decision concerning the reach of Congress to activities affecting interstate commerce"); *ante*, at 2 (SCALIA, J., concurring in judgment). We held in *Lopez* that the Gun-Free School Zones Act could not be sustained as an exercise of that power.

Our decision about whether gun possession in school zones substantially affected interstate commerce turned on four considerations. *Lopez, supra,* at 559–567; see also *Morrison, supra,* at 609–613. First, we observed that our "substantial effects" cases generally have upheld federal regulation of economic activity that affected interstate commerce, but that §922(q) was a criminal statute having "nothing to do with 'commerce' or any sort of economic enterprise." *Lopez,* 514 U. S., at 561. In this regard, we also noted that "[s]ection 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Ibid.* Second, we noted that the statute contained no express jurisdictional requirement establishing its connection to interstate commerce. *Ibid.*

Third, we found telling the absence of legislative findings about the regulated conduct's impact on interstate commerce. We explained that while express legislative findings are neither required nor, when provided, dispositive, findings "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Id.,* at 563. Finally, we rejected as too attenuated the Government's argument that firearm possession in school zones could result in violent crime which in turn could adversely affect the

national economy. *Id.*, at 563–567. The Constitution, we said, does not tolerate reasoning that would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.*, at 567. Later in *Morrison, supra*, we relied on the same four considerations to hold that §40302 of the Violence Against Women Act of 1994, 42 U. S. C. §13981, exceeded Congress' authority under the Commerce Clause.

In my view, the case before us is materially indistinguishable from *Lopez* and *Morrison* when the same considerations are taken into account.

## II

### A

What is the relevant conduct subject to Commerce Clause analysis in this case? The Court takes its cues from Congress, applying the above considerations to the activity regulated by the Controlled Substances Act (CSA) in general. The Court's decision rests on two facts about the CSA: (1) Congress chose to enact a single statute providing a comprehensive prohibition on the production, distribution, and possession of all controlled substances, and (2) Congress did not distinguish between various forms of intrastate noncommercial cultivation, possession, and use of marijuana. See 21 U. S. C. §§841(a)(1), 844(a). Today's decision suggests that the federal regulation of local activity is immune to Commerce Clause challenge because Congress chose to act with an ambitious, all-encompassing statute, rather than piecemeal. In my view, allowing Congress to set the terms of the constitutional debate in this way, *i.e.*, by packaging regulation of local activity in broader schemes, is tantamount to removing meaningful limits on the Commerce Clause.

The Court's principal means of distinguishing *Lopez* from this case is to observe that the Gun-Free School Zones Act of 1990 was a "brief, single-subject statute,"

*ante*, at 20, see also *ante,* at 19, whereas the CSA is "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances,'" *ibid.* Thus, according to the Court, it was possible in *Lopez* to evaluate in isolation the constitutionality of criminalizing local activity (there gun possession in school zones), whereas the local activity that the CSA targets (in this case cultivation and possession of marijuana for personal medicinal use) cannot be separated from the general drug control scheme of which it is a part.

Today's decision allows Congress to regulate intrastate activity without check, so long as there is some implication by legislative design that regulating intrastate activity is essential (and the Court appears to equate "essential" with "necessary") to the interstate regulatory scheme. Seizing upon our language in *Lopez* that the statute prohibiting gun possession in school zones was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated," 514 U. S., at 561, the Court appears to reason that the placement of local activity in a comprehensive scheme confirms that it is essential to that scheme. *Ante*, at 21–22. If the Court is right, then *Lopez* stands for nothing more than a drafting guide: Congress should have described the relevant crime as "transfer or possession of a firearm anywhere in the nation"—thus including commercial and noncommercial activity, and clearly encompassing some activity with assuredly substantial effect on interstate commerce. Had it done so, the majority hints, we would have sustained its authority to regulate possession of firearms in school zones. Furthermore, today's decision suggests we would readily sustain a congressional decision to attach the regulation of intrastate activity to a pre-existing comprehensive (or even not-so-comprehensive) scheme. If so, the Court invites in-

creased federal regulation of local activity even if, as it suggests, Congress would not enact a *new* interstate scheme exclusively for the sake of reaching intrastate activity, see *ante*, at 22, n. 33; *ante*, at 6 (SCALIA, J., concurring in judgment).

I cannot agree that our decision in *Lopez* contemplated such evasive or overbroad legislative strategies with approval. Until today, such arguments have been made only in dissent. See *Morrison*, 529 U. S., at 657 (BREYER, J., dissenting) (given that Congress can regulate "'an essential part of a larger regulation of economic activity,'" "can Congress save the present law by including it, or much of it, in a broader 'Safe Transport' or 'Worker Safety' act?"). *Lopez* and *Morrison* did not indicate that the constitutionality of federal regulation depends on superficial and formalistic distinctions. Likewise I did not understand our discussion of the role of courts in enforcing outer limits of the Commerce Clause for the sake of maintaining the federalist balance our Constitution requires, see *Lopez*, 514 U. S., at 557; *id.*, at 578 (KENNEDY, J., concurring), as a signal to Congress to enact legislation that is more extensive and more intrusive into the domain of state power. If the Court always defers to Congress as it does today, little may be left to the notion of enumerated powers.

The hard work for courts, then, is to identify objective markers for confining the analysis in Commerce Clause cases. Here, respondents challenge the constitutionality of the CSA as applied to them and those similarly situated. I agree with the Court that we must look beyond respondents' own activities. Otherwise, individual litigants could always exempt themselves from Commerce Clause regulation merely by pointing to the obvious—that their personal activities do not have a substantial effect on interstate commerce. See *Maryland* v. *Wirtz*, 392 U. S. 183, 193 (1968); *Wickard*, 317 U. S., at 127–128. The task is to

identify a mode of analysis that allows Congress to regulate more than nothing (by declining to reduce each case to its litigants) and less than everything (by declining to let Congress set the terms of analysis). The analysis may not be the same in every case, for it depends on the regulatory scheme at issue and the federalism concerns implicated. See generally *Lopez,* 514 U. S., at 567; *id.,* at 579 (KENNEDY, J., concurring).

A number of objective markers are available to confine the scope of constitutional review here. Both federal and state legislation—including the CSA itself, the California Compassionate Use Act, and other state medical marijuana legislation—recognize that medical and nonmedical (*i.e.,* recreational) uses of drugs are realistically distinct and can be segregated, and regulate them differently. See 21 U. S. C. §812; Cal. Health & Safety Code Ann. §11362.5 (West Supp. 2005); *ante,* at 1 (opinion of the Court). Respondents challenge only the application of the CSA to medicinal use of marijuana. Cf. *United States* v. *Raines,* 362 U. S. 17, 20–22 (1960) (describing our preference for as-applied rather than facial challenges). Moreover, because fundamental structural concerns about dual sovereignty animate our Commerce Clause cases, it is relevant that this case involves the interplay of federal and state regulation in areas of criminal law and social policy, where "States lay claim by right of history and expertise." *Lopez, supra,* at 583 (KENNEDY, J., concurring); see also *Morrison, supra,* at 617–619; *Lopez, supra,* at 580 (KENNEDY, J., concurring) ("The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required"); cf. *Garcia,* 469 U. S., at 586 (O'CONNOR, J., dissenting) ("[S]tate autonomy is a relevant factor in assessing the means by which Congress exercises its powers" under the Commerce Clause). California, like other States, has drawn on its reserved powers to distin-

guish the regulation of medicinal marijuana. To ascertain whether Congress' encroachment is constitutionally justified in this case, then, I would focus here on the personal cultivation, possession, and use of marijuana for medicinal purposes.

## B

Having thus defined the relevant conduct, we must determine whether, under our precedents, the conduct is economic and, in the aggregate, substantially affects interstate commerce. Even if intrastate cultivation and possession of marijuana for one's own medicinal use can properly be characterized as economic, and I question whether it can, it has not been shown that such activity substantially affects interstate commerce. Similarly, it is neither self-evident nor demonstrated that regulating such activity is necessary to the interstate drug control scheme.

The Court's definition of economic activity is breathtaking. It defines as economic any activity involving the production, distribution, and consumption of commodities. And it appears to reason that when an interstate market for a commodity exists, regulating the intrastate manufacture or possession of that commodity is constitutional either because that intrastate activity is itself economic, or because regulating it is a rational part of regulating its market. Putting to one side the problem endemic to the Court's opinion—the shift in focus from the activity at issue in this case to the entirety of what the CSA regulates, see *Lopez*, *supra*, at 565 ("depending on the level of generality, any activity can be looked upon as commercial")—the Court's definition of economic activity for purposes of Commerce Clause jurisprudence threatens to sweep all of productive human activity into federal regulatory reach.

The Court uses a dictionary definition of economics to

skirt the real problem of drawing a meaningful line between "what is national and what is local," *Jones & Laughlin Steel*, 301 U. S., at 37. It will not do to say that Congress may regulate noncommercial activity simply because it may have an effect on the demand for commercial goods, or because the noncommercial endeavor can, in some sense, substitute for commercial activity. Most commercial goods or services have some sort of privately producible analogue. Home care substitutes for daycare. Charades games substitute for movie tickets. Backyard or windowsill gardening substitutes for going to the supermarket. To draw the line wherever private activity affects the demand for market goods is to draw no line at all, and to declare everything economic. We have already rejected the result that would follow—a federal police power. *Lopez*, *supra*, at 564.

In *Lopez* and *Morrison*, we suggested that economic activity usually relates directly to commercial activity. See *Morrison*, 529 U. S., at 611, n. 4 (intrastate activities that have been within Congress' power to regulate have been "of an apparent commercial character"); *Lopez*, 514 U. S., at 561 (distinguishing the Gun-Free School Zones Act of 1990 from "activities that arise out of or are connected with a commercial transaction"). The homegrown cultivation and personal possession and use of marijuana for medicinal purposes has no apparent commercial character. Everyone agrees that the marijuana at issue in this case was never in the stream of commerce, and neither were the supplies for growing it. (Marijuana is highly unusual among the substances subject to the CSA in that it can be cultivated without any materials that have traveled in interstate commerce.) *Lopez* makes clear that possession is not itself commercial activity. *Ibid*. And respondents have not come into possession by means of any commercial transaction; they have simply grown, in their own homes, marijuana for their own use, without

acquiring, buying, selling, or bartering a thing of value. Cf. *id.,* at 583 (KENNEDY, J., concurring) ("The statute now before us forecloses the States from experimenting . . . and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term").

The Court suggests that *Wickard*, which we have identified as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," *Lopez, supra,* at 560, established federal regulatory power over any home consumption of a commodity for which a national market exists. I disagree. *Wickard* involved a challenge to the Agricultural Adjustment Act of 1938 (AAA), which directed the Secretary of Agriculture to set national quotas on wheat production, and penalties for excess production. 317 U. S., at 115–116. The AAA itself confirmed that Congress made an explicit choice not to reach—and thus the Court could not possibly have approved of federal control over—small-scale, noncommercial wheat farming. In contrast to the CSA's limitless assertion of power, Congress provided an exemption within the AAA for small producers. When Filburn planted the wheat at issue in *Wickard*, the statute exempted plantings less than 200 bushels (about six tons), and when he harvested his wheat it exempted plantings less than six acres. *Id.*, at 130, n. 30. *Wickard,* then, did not extend Commerce Clause authority to something as modest as the home cook's herb garden. This is not to say that Congress may never regulate small quantities of commodities possessed or produced for personal use, or to deny that it sometimes needs to enact a zero tolerance regime for such commodities. It is merely to say that *Wickard* did not hold or imply that small-scale production of commodities is always economic, and automatically within Congress' reach.

Even assuming that economic activity is at issue in this case, the Government has made no showing in fact that

the possession and use of homegrown marijuana for medical purposes, in California or elsewhere, has a substantial effect on interstate commerce. Similarly, the Government has not shown that regulating such activity is necessary to an interstate regulatory scheme. Whatever the specific theory of "substantial effects" at issue (*i.e.*, whether the activity substantially affects interstate commerce, whether its regulation is necessary to an interstate regulatory scheme, or both), a concern for dual sovereignty requires that Congress' excursion into the traditional domain of States be justified.

That is why characterizing this as a case about the Necessary and Proper Clause does not change the analysis significantly. Congress must exercise its authority under the Necessary and Proper Clause in a manner consistent with basic constitutional principles. *Garcia*, 469 U. S., at 585 (O'CONNOR, J., dissenting) ("It is not enough that the 'end be legitimate'; the means to that end chosen by Congress must not contravene the spirit of the Constitution"). As JUSTICE SCALIA recognizes, see *ante*, at 7 (opinion concurring in judgment), Congress cannot use its authority under the Clause to contravene the principle of state sovereignty embodied in the Tenth Amendment. *Ibid.* Likewise, that authority must be used in a manner consistent with the notion of enumerated powers—a structural principle that is as much part of the Constitution as the Tenth Amendment's explicit textual command. Accordingly, something more than mere assertion is required when Congress purports to have power over local activity whose connection to an intrastate market is not self-evident. Otherwise, the Necessary and Proper Clause will always be a back door for unconstitutional federal regulation. Cf. *Printz* v. *United States*, 521 U. S. 898, 923 (1997) (the Necessary and Proper Clause is "the last, best hope of those who defend ultra vires congressional action"). Indeed, if it were enough in "substantial effects" cases for

the Court to supply conceivable justifications for intra-
state regulation related to an interstate market, then we
could have surmised in *Lopez* that guns in school zones
are "never more than an instant from the interstate mar-
ket" in guns already subject to extensive federal regula-
tion, *ante*, at 8 (SCALIA, J., concurring in judgment), recast
*Lopez* as a Necessary and Proper Clause case, and thereby
upheld the Gun-Free School Zones Act of 1990. (According
to the Court's and the concurrence's logic, for example, the
*Lopez* court should have reasoned that the prohibition on
gun possession in school zones could be an appropriate
means of effectuating a related prohibition on "sell[ing]" or
"deliver[ing]" firearms or ammunition to "any individual
who the licensee knows or has reasonable cause to believe
is less than eighteen years of age." 18 U. S. C. §922(b)(1)
(1988 ed., Supp. II).)

There is simply no evidence that homegrown medicinal
marijuana users constitute, in the aggregate, a sizable
enough class to have a discernable, let alone substantial,
impact on the national illicit drug market—or otherwise to
threaten the CSA regime. Explicit evidence is helpful
when substantial effect is not "visible to the naked eye."
See *Lopez*, 514 U. S., at 563. And here, in part because
common sense suggests that medical marijuana users may
be limited in number and that California's Compassionate
Use Act and similar state legislation may well isolate
activities relating to medicinal marijuana from the illicit
market, the effect of those activities on interstate drug
traffic is not self-evidently substantial.

In this regard, again, this case is readily distinguishable
from *Wickard*. To decide whether the Secretary could
regulate local wheat farming, the Court looked to "the
actual effects of the activity in question upon interstate
commerce." 317 U. S., at 120. Critically, the Court was
able to consider "actual effects" because the parties had
"stipulated a summary of the economics of the wheat

industry." *Id.*, at 125. After reviewing in detail the picture of the industry provided in that summary, the Court explained that consumption of homegrown wheat was the most variable factor in the size of the national wheat crop, and that on-site consumption could have the effect of varying the amount of wheat sent to market by as much as 20 percent. *Id.*, at 127. With real numbers at hand, the *Wickard* Court could easily conclude that "a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions" nationwide. *Id.*, at 128; see also *id.*, at 128–129 ("This record leaves us in no doubt" about substantial effects).

The Court recognizes that "the record in the *Wickard* case itself established the causal connection between the production for local use and the national market" and argues that "we have before us findings by Congress *to the same effect*." *Ante*, at 17 (emphasis added). The Court refers to a series of declarations in the introduction to the CSA saying that (1) local distribution and possession of controlled substances causes "swelling" in interstate traffic; (2) local production and distribution cannot be distinguished from interstate production and distribution; (3) federal control over intrastate incidents "is essential to effective control" over interstate drug trafficking. 21 U. S. C. §§801(1)–(6). These bare declarations cannot be compared to the record before the Court in *Wickard*.

They amount to nothing more than a legislative insistence that the regulation of controlled substances must be absolute. They are asserted without any supporting evidence—descriptive, statistical, or otherwise. "[S]imply because Congress may conclude a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 311 (1981) (REHNQUIST, J., concurring in judgment). Indeed, if declarations like these

suffice to justify federal regulation, and if the Court today is right about what passes rationality review before us, then our decision in *Morrison* should have come out the other way. In that case, Congress had supplied numerous findings regarding the impact gender-motivated violence had on the national economy. 529 U. S., at 614; *id.,* at 628–636 (SOUTER, J., dissenting) (chronicling findings). But, recognizing that ""'"[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question,"'" we found Congress' detailed findings inadequate. *Id.,* at 614 (quoting *Lopez, supra,* at 557, n. 2, in turn quoting *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 273 (1964) (Black, J., concurring)). If, as the Court claims, today's decision does not break with precedent, how can it be that voluminous findings, documenting extensive hearings about the specific topic of violence against women, did not pass constitutional muster in *Morrison*, while the CSA's abstract, unsubstantiated, generalized findings about controlled substances do?

In particular, the CSA's introductory declarations are too vague and unspecific to demonstrate that the federal statutory scheme will be undermined if Congress cannot exert power over individuals like respondents. The declarations are not even specific to marijuana. (Facts about substantial effects may be developed in litigation to compensate for the inadequacy of Congress' findings; in part because this case comes to us from the grant of a preliminary injunction, there has been no such development.) Because here California, like other States, has carved out a limited class of activity for distinct regulation, the inadequacy of the CSA's findings is especially glaring. The California Compassionate Use Act exempts from other state drug laws patients and their caregivers "who posses[s] or cultivat[e] marijuana for the *personal* medical

purposes of the patient upon the written or oral recommendation of a physician" to treat a list of serious medical conditions. Cal. Health & Safety Code Ann. §§11362.5(d), 11362.7(h) (West Supp. 2005) (emphasis added). Compare *ibid.* with, *e.g.*, §11357(b) (West 1991) (criminalizing marijuana possession in excess of 28.5 grams); §11358 (criminalizing marijuana cultivation). The Act specifies that it should not be construed to supersede legislation prohibiting persons from engaging in acts dangerous to others, or to condone the diversion of marijuana for nonmedical purposes. §11362.5(b)(2) (West Supp. 2005). To promote the Act's operation and to facilitate law enforcement, California recently enacted an identification card system for qualified patients. §§11362.7–11362.83. We generally assume States enforce their laws, see *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 795 (1988), and have no reason to think otherwise here.

The Government has not overcome empirical doubt that the number of Californians engaged in personal cultivation, possession, and use of medical marijuana, or the amount of marijuana they produce, is enough to threaten the federal regime. Nor has it shown that Compassionate Use Act marijuana users have been or are realistically likely to be responsible for the drug's seeping into the market in a significant way. The Government does cite one estimate that there were over 100,000 Compassionate Use Act users in California in 2004, Reply Brief for Petitioners 16, but does not explain, in terms of proportions, what their presence means for the national illicit drug market. See generally *Wirtz*, 392 U. S., at 196, n. 27 (Congress cannot use "a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities"); cf. General Accounting Office, Marijuana: Early Experience with Four States' Laws That Allow Use for Medical Purposes 21–23 (Rep. No. 03–189, Nov. 2002), http://www.gao.gov/new.items/d03189.pdf (as

visited June 3, 2005 and available in Clerk of Court's case file) (in four California counties before the identification card system was enacted, voluntarily registered medical marijuana patients were less than 0.5 percent of the population; in Alaska, Hawaii, and Oregon, statewide medical marijuana registrants represented less than 0.05 percent of the States' populations).  It also provides anecdotal evidence about the CSA's enforcement.  See Reply Brief for Petitioners 17–18.  The Court also offers some arguments about the effect of the Compassionate Use Act on the national market.  It says that the California statute might be vulnerable to exploitation by unscrupulous physicians, that Compassionate Use Act patients may overproduce, and that the history of the narcotics trade shows the difficulty of cordoning off any drug use from the rest of the market.  These arguments are plausible; if borne out in fact they could justify prosecuting Compassionate Use Act patients under the federal CSA.  But, without substantiation, they add little to the CSA's conclusory statements about diversion, essentiality, and market effect.  Piling assertion upon assertion does not, in my view, satisfy the substantiality test of *Lopez* and *Morrison*.

## III

We would do well to recall how James Madison, the father of the Constitution, described our system of joint sovereignty to the people of New York: "The powers delegated by the proposed constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite. . . . The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."  The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961).

O'CONNOR, J., dissenting

Relying on Congress' abstract assertions, the Court has endorsed making it a federal crime to grow small amounts of marijuana in one's own home for one's own medicinal use. This overreaching stifles an express choice by some States, concerned for the lives and liberties of their people, to regulate medical marijuana differently. If I were a California citizen, I would not have voted for the medical marijuana ballot initiative; if I were a California legislator I would not have supported the Compassionate Use Act. But whatever the wisdom of California's experiment with medical marijuana, the federalism principles that have driven our Commerce Clause cases require that room for experiment be protected in this case. For these reasons I dissent.

# SUPREME COURT OF THE UNITED STATES

————

No. 03–1454

————

## ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* ANGEL MCCLARY RAICH ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 6, 2005]

JUSTICE THOMAS, dissenting.

Respondents Diane Monson and Angel Raich use marijuana that has never been bought or sold, that has never crossed state lines, and that has had no demonstrable effect on the national market for marijuana. If Congress can regulate this under the Commerce Clause, then it can regulate virtually anything—and the Federal Government is no longer one of limited and enumerated powers.

I

Respondents' local cultivation and consumption of marijuana is not "Commerce . . . among the several States." U. S. Const., Art. I, §8, cl. 3. By holding that Congress may regulate activity that is neither interstate nor commerce under the Interstate Commerce Clause, the Court abandons any attempt to enforce the Constitution's limits on federal power. The majority supports this conclusion by invoking, without explanation, the Necessary and Proper Clause. Regulating respondents' conduct, however, is not "necessary and proper for carrying into Execution" Congress' restrictions on the interstate drug trade. Art. I, §8, cl. 18. Thus, neither the Commerce Clause nor the Necessary and Proper Clause grants Congress the power to regulate respondents' conduct.

A

As I explained at length in *United States* v. *Lopez,* 514 U. S. 549 (1995), the Commerce Clause empowers Congress to regulate the buying and selling of goods and services trafficked across state lines.   *Id.*, at 586–589 (concurring opinion).   The Clause's text, structure, and history all indicate that, at the time of the founding, the term "'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes."   *Id.*, at 585 (THOMAS, J., concurring).   Commerce, or trade, stood in contrast to productive activities like manufacturing and agriculture.   *Id.*, at 586–587 (THOMAS, J., concurring). Throughout founding-era dictionaries, Madison's notes from the Constitutional Convention, The Federalist Papers, and the ratification debates, the term "commerce" is consistently used to mean trade or exchange—not all economic or gainful activity that has some attenuated connection to trade or exchange.   *Ibid.* (THOMAS, J., concurring); Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101, 112–125 (2001).   The term "commerce" commonly meant trade or exchange (and shipping for these purposes) not simply to those involved in the drafting and ratification processes, but also to the general public.   Barnett, New Evidence of the Original Meaning of the Commerce Clause, 55 Ark. L. Rev. 847, 857–862 (2003).

Even the majority does not argue that respondents' conduct is itself "Commerce among the several States."   Art. I, §8, cl. 3.   *Ante*, at 19.   Monson and Raich neither buy nor sell the marijuana that they consume.   They cultivate their cannabis entirely in the State of California—it never crosses state lines, much less as part of a commercial transaction.   Certainly no evidence from the founding suggests that "commerce" included the mere possession of a good or some purely personal activity that did not involve trade or exchange for value.   In the early days of the

Republic, it would have been unthinkable that Congress could prohibit the local cultivation, possession, and consumption of marijuana.

On this traditional understanding of "commerce," the Controlled Substances Act (CSA), 21 U. S. C. §801 *et seq.*, regulates a great deal of marijuana trafficking that is interstate and commercial in character. The CSA does not, however, criminalize only the interstate buying and selling of marijuana. Instead, it bans the entire market—intrastate or interstate, noncommercial or commercial—for marijuana. Respondents are correct that the CSA exceeds Congress' commerce power as applied to their conduct, which is purely intrastate and noncommercial.

## B

More difficult, however, is whether the CSA is a valid exercise of Congress' power to enact laws that are "necessary and proper for carrying into Execution" its power to regulate interstate commerce. Art. I, §8, cl. 18. The Necessary and Proper Clause is not a warrant to Congress to enact any law that bears some conceivable connection to the exercise of an enumerated power.[1] Nor is it, however, a command to Congress to enact only laws that are absolutely indispensable to the exercise of an enumerated power.[2]

In *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), this Court, speaking through Chief Justice Marshall, set forth a test for determining when an Act of Congress is permissible under the Necessary and Proper Clause:

---

[1] *McCulloch* v. *Maryland,* 4 Wheat. 316, 419–421 (1819); Madison, The Bank Bill, House of Representatives (Feb. 2, 1791), in 3 The Founders' Constitution 244 (P. Kurland & R. Lerner eds. 1987) (requiring "direct" rather than "remote" means-end fit); Hamilton, Opinion on the Constitutionality of the Bank (Feb. 23, 1791), in *id.*, at 248, 250 (requiring "obvious" means-end fit, where the end was "clearly comprehended within any of the specified powers" of Congress).

[2] *McCulloch*, *supra*, at 413–415; D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 162 (1985).

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id.*, at 421.

To act under the Necessary and Proper Clause, then, Congress must select a means that is "appropriate" and "plainly adapted" to executing an enumerated power; the means cannot be otherwise "prohibited" by the Constitution; and the means cannot be inconsistent with "the letter and spirit of the [C]onstitution." *Ibid.;* D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, pp. 163–164 (1985). The CSA, as applied to respondents' conduct, is not a valid exercise of Congress' power under the Necessary and Proper Clause.

1

Congress has exercised its power over interstate commerce to criminalize trafficking in marijuana across state lines. The Government contends that banning Monson and Raich's intrastate drug activity is "necessary and proper for carrying into Execution" its regulation of interstate drug trafficking. Art. I, §8, cl. 18. See 21 U. S. C. §801(6). However, in order to be "necessary," the intrastate ban must be more than "a reasonable means [of] effectuat[ing] the regulation of interstate commerce." Brief for Petitioners 14; see *ante*, at 19 (majority opinion) (employing rational-basis review). It must be "plainly adapted" to regulating interstate marijuana trafficking— in other words, there must be an "obvious, simple, and direct relation" between the intrastate ban and the regulation of interstate commerce. *Sabri* v. *United States,* 541 U. S. 600, 613 (2004) (THOMAS, J., concurring in judgment); see also *United States* v. *Dewitt,* 9 Wall. 41, 44 (1870) (finding ban on intrastate sale of lighting oils not "appropriate and plainly adapted means for carrying into execution"

Congress' taxing power).

On its face, a ban on the intrastate cultivation, possession and distribution of marijuana may be plainly adapted to stopping the interstate flow of marijuana. Unregulated local growers and users could swell both the supply and the demand sides of the interstate marijuana market, making the market more difficult to regulate. *Ante*, at 9–10, 19 (majority opinion). But respondents do not challenge the CSA on its face. Instead, they challenge it as applied to their conduct. The question is thus whether the intrastate ban is "necessary and proper" as applied to medical marijuana users like respondents.[3]

Respondents are not regulable simply because they belong to a large class (local growers and users of marijuana) that Congress might need to reach, if they also belong to a distinct and separable subclass (local growers and users of state-authorized, medical marijuana) that does not undermine the CSA's interstate ban. *Ante*, at 6–7 (O'CONNOR, J., dissenting). The Court of Appeals found that respondents' "limited use is distinct from the broader illicit drug market," because "th[eir] medicinal marijuana . . . is not intended for, nor does it enter, the stream of commerce." *Raich* v. *Ashcroft*, 352 F. 3d 1222, 1228 (CA9 2003). If that is generally true of individuals who grow and use marijuana for medical purposes under state law, then even assuming Congress has "obvious" and "plain" reasons why regulating intrastate cultivation and possession is necessary to regulating the interstate drug trade, none of those reasons applies to medical marijuana patients like Monson and Raich.

——————

[3] Because respondents do not challenge on its face the CSA's ban on marijuana, 21 U. S. C. §§841(a)(1), 844(a), our adjudication of their as-applied challenge casts no doubt on this Court's practice in *United States* v. *Lopez,* 514 U. S. 549 (1995), and *United States* v. *Morrison,* 529 U. S. 598 (2000). In those cases, we held that Congress, in enacting the statutes at issue, had exceeded its Article I powers.

California's Compassionate Use Act sets respondents' conduct apart from other intrastate producers and users of marijuana. The Act channels marijuana use to "seriously ill Californians," Cal. Health & Safety Code Ann. §11362.5(b)(1)(A) (West Supp. 2005), and prohibits "the diversion of marijuana for nonmedical purposes," §11362.5(b)(2).[4] California strictly controls the cultivation and possession of marijuana for medical purposes. To be eligible for its program, California requires that a patient have an illness that cannabis can relieve, such as cancer, AIDS, or arthritis, §11362.5(b)(1)(A), and that he obtain a physician's recommendation or approval, §11362.5(d). Qualified patients must provide personal and medical information to obtain medical identification cards, and there is a statewide registry of cardholders. §§11362.715– .76. Moreover, the Medical Board of California has issued guidelines for physicians' cannabis recommendations, and it sanctions physicians who do not comply with the guidelines. See, *e.g.*, *People* v. *Spark*, 121 Cal. App. 4th 259, 263, 16 Cal. Rptr. 3d 840, 843 (2004).

This class of intrastate users is therefore distinguishable from others. We normally presume that States enforce their own laws, *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 795 (1988), and there is no reason to depart from that presumption here: Nothing suggests that California's controls are ineffective. The scant evidence that exists suggests that few people—the vast majority of whom are aged 40 or older—register to use medical marijuana. General Accounting Office, Marijuana: Early Experiences with Four States' Laws That Allow Use for Medical Purposes 22–23 (Rep. No. 03–189, Nov. 2002), http://www.gao.gov/new.items/d01389.pdf (all Internet

---

[4] Other States likewise prohibit diversion of marijuana for nonmedical purposes. See, *e.g.*, Colo. Const., Art. XVIII, §14(2)(d); Nev. Rev. Stat. §§453A.300(1)(e)–(f) (2003); Ore. Rev. Stat. §§475.316(1)(c)–(d) (2003).

materials as visited on June 3, 2005, and available in Clerk of Court's case file). In part because of the low incidence of medical marijuana use, many law enforcement officials report that the introduction of medical marijuana laws has not affected their law enforcement efforts. *Id.*, at 32.

These controls belie the Government's assertion that placing medical marijuana outside the CSA's reach "would prevent effective enforcement of the interstate ban on drug trafficking." Brief for Petitioners 33. Enforcement of the CSA can continue as it did prior to the Compassionate Use Act. Only now, a qualified patient could avoid arrest or prosecution by presenting his identification card to law enforcement officers. In the event that a qualified patient is arrested for possession or his cannabis is seized, he could seek to prove as an affirmative defense that, in conformity with state law, he possessed or cultivated small quantities of marijuana intrastate solely for personal medical use. *People* v. *Mower*, 28 Cal. 4th 457, 469–470, 49 P. 3d 1067, 1073–1075 (2002); *People* v. *Trippet*, 56 Cal. App. 4th 1532, 1549 (1997). Moreover, under the CSA, certain drugs that present a high risk of abuse and addiction but that nevertheless have an accepted medical use— drugs like morphine and amphetamines—are available by prescription. 21 U. S. C. §§812(b)(2)(A)–(B); 21 CFR §1308.12 (2004). No one argues that permitting use of these drugs under medical supervision has undermined the CSA's restrictions.

But even assuming that States' controls allow some seepage of medical marijuana into the illicit drug market, there is a multibillion-dollar interstate market for marijuana. Executive Office of the President, Office of Nat. Drug Control Policy, Marijuana Fact Sheet 5 (Feb. 2004), http://www.whitehousedrugpolicy.gov/publications/factsht/ marijuana/index.html. It is difficult to see how this vast market could be affected by diverted medical cannabis, let alone in a way that makes regulating intrastate medical

marijuana obviously essential to controlling the interstate drug market.

To be sure, Congress declared that state policy would disrupt federal law enforcement. It believed the across-the-board ban essential to policing interstate drug trafficking. 21 U. S. C. §801(6). But as JUSTICE O'CONNOR points out, Congress presented no evidence in support of its conclusions, which are not so much findings of fact as assertions of power. *Ante*, at 13–14 (dissenting opinion). Congress cannot define the scope of its own power merely by declaring the necessity of its enactments.

In sum, neither in enacting the CSA nor in defending its application to respondents has the Government offered any obvious reason why banning medical marijuana use is necessary to stem the tide of interstate drug trafficking. Congress' goal of curtailing the interstate drug trade would not plainly be thwarted if it could not apply the CSA to patients like Monson and Raich. That is, unless Congress' aim is really to exercise police power of the sort reserved to the States in order to eliminate even the intrastate possession and use of marijuana.

2

Even assuming the CSA's ban on locally cultivated and consumed marijuana is "necessary," that does not mean it is also "proper." The means selected by Congress to regulate interstate commerce cannot be "prohibited" by, or inconsistent with the "letter and spirit" of, the Constitution. *McCulloch*, 4 Wheat., at 421.

In *Lopez*, I argued that allowing Congress to regulate intrastate, noncommercial activity under the Commerce Clause would confer on Congress a general "police power" over the Nation. 514 U. S., at 584, 600 (concurring opinion). This is no less the case if Congress ties its power to the Necessary and Proper Clause rather than the Commerce Clause. When agents from the Drug Enforcement

Administration raided Monson's home, they seized six cannabis plants. If the Federal Government can regulate growing a half-dozen cannabis plants for personal consumption (not because it is interstate commerce, but because it is inextricably bound up with interstate commerce), then Congress' Article I powers—as expanded by the Necessary and Proper Clause—have no meaningful limits. Whether Congress aims at the possession of drugs, guns, or any number of other items, it may continue to "appropria[te] state police powers under the guise of regulating commerce." *United States* v. *Morrison,* 529 U. S. 598, 627 (2000) (THOMAS, J., concurring).

Even if Congress may regulate purely intrastate activity when essential to exercising some enumerated power, see *Dewitt,* 9 Wall., at 44; but see Barnett, The Original Meaning of the Necessary and Proper Clause, 6 U. Pa. J. Const. L. 183, 186 (2003) (detailing statements by Founders that the Necessary and Proper Clause was not intended to expand the scope of Congress' enumerated powers), Congress may not use its incidental authority to subvert basic principles of federalism and dual sovereignty. *Printz* v. *United States,* 521 U. S. 898, 923–924 (1997); *Alden* v. *Maine,* 527 U. S. 706, 732–733 (1999); *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528, 585 (1985) (O'CONNOR, J., dissenting); The Federalist No. 33, pp. 204–205 (J. Cooke ed. 1961) (A. Hamilton) (hereinafter The Federalist).

Here, Congress has encroached on States' traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens.[5] *Brecht* v.

---

[5] In fact, the Anti-Federalists objected that the Necessary and Proper Clause would allow Congress, *inter alia*, to "*constitute new Crimes*, . . . and extend [its] Power as far as [it] shall think proper; so that the State Legislatures have no Security for the Powers now presumed to remain to them; or the People for their Rights." Mason, Objections to the Constitution Formed by the Convention (1787), in 2 The Complete Anti-

*Abrahamson,* 507 U. S. 619, 635 (1993); *Hillsborough County* v. *Automated Medical Laboratories, Inc.,* 471 U. S. 707, 719 (1985). Further, the Government's rationale—that it may regulate the production or possession of any commodity for which there is an interstate market—threatens to remove the remaining vestiges of States' traditional police powers. See Brief for Petitioners 21–22; cf. Ehrlich, The Increasing Federalization of Crime, 32 Ariz. St. L. J. 825, 826, 841 (2000) (describing both the relative recency of a large percentage of federal crimes and the lack of a relationship between some of these crimes and interstate commerce). This would convert the Necessary and Proper Clause into precisely what Chief Justice Marshall did not envision, a "pretext . . . for the accomplishment of objects not intrusted to the government." *McCulloch*, *supra*, at 423.

## II

The majority advances three reasons why the CSA is a legitimate exercise of Congress' authority under the Commerce Clause: First, respondents' conduct, taken in the aggregate, may substantially affect interstate commerce, *ante*, at 19; second, regulation of respondents' conduct is essential to regulating the interstate marijuana market, *ante*, at 21–22; and, third, regulation of respondents'

---

Federalist 11, 12–13 (H. Storing ed. 1981) (emphasis added). Hamilton responded that these objections were gross "misrepresentation[s]." The Federalist No. 33, at 204. He termed the Clause "perfectly harmless," for it merely confirmed Congress' implied authority to enact laws in exercising its enumerated powers. *Id.*, at 205; see also *Lopez,* 514 U. S., at 597, n. 6 (THOMAS, J., concurring) (discussing Congress' limited ability to establish nationwide criminal prohibitions); *Cohens* v. *Virginia,* 6 Wheat. 264, 426–428 (1821) (finding it "clear that [C]ongress cannot punish felonies generally," except in areas over which it possesses plenary power). According to Hamilton, the Clause was needed only "to guard against cavilling refinements" by those seeking to cripple federal power. The Federalist No. 33, at 205; *id.*, No. 44, at 303–304 (J. Madison).

conduct is incidental to regulating the interstate marijuana market, *ante*, at 19–20. JUSTICE O'CONNOR explains why the majority's reasons cannot be reconciled with our recent Commerce Clause jurisprudence. The majority's justifications, however, suffer from even more fundamental flaws.

A

The majority holds that Congress may regulate intrastate cultivation and possession of medical marijuana under the Commerce Clause, because such conduct arguably has a substantial effect on interstate commerce. The majority's decision is further proof that the "substantial effects" test is a "rootless and malleable standard" at odds with the constitutional design. *Morrison*, *supra*, at 627 (THOMAS, J., concurring).

The majority's treatment of the substantial effects test is rootless, because it is not tethered to either the Commerce Clause or the Necessary and Proper Clause. Under the Commerce Clause, Congress may regulate interstate commerce, not activities that substantially affect interstate commerce—any more than Congress may regulate activities that do not fall within, but that affect, the subjects of its other Article I powers. *Lopez*, *supra,* at 589 (THOMAS, J., concurring). Whatever additional latitude the Necessary and Proper Clause affords, *supra*, at 9–10, the question is whether Congress' legislation is essential to the regulation of interstate commerce itself—not whether the legislation extends only to economic activities that substantially affect interstate commerce. *Supra*, at 4; *ante*, at 5 (SCALIA, J., concurring in judgment).

The majority's treatment of the substantial effects test is malleable, because the majority expands the relevant conduct. By defining the class at a high level of generality (as the intrastate manufacture and possession of marijuana), the majority overlooks that individuals authorized

by state law to manufacture and possess medical mari-
juana exert no demonstrable effect on the interstate drug
market.  *Supra*, at 7–8.  The majority ignores that
whether a particular activity substantially affects inter-
state commerce—and thus comes within Congress' reach
on the majority's approach—can turn on a number of
objective factors, like state action or features of the regu-
lated activity itself.  *Ante*, at 6–7 (O'CONNOR, J., dissent-
ing).  For instance, here, if California and other States are
effectively regulating medical marijuana users, then these
users have little effect on the interstate drug trade.[6]

The substantial effects test is easily manipulated for
another reason.  This Court has never held that Congress
can regulate noneconomic activity that substantially
affects interstate commerce.  *Morrison*, 529 U. S., at 613
("[T]hus far in our Nation's history our cases have upheld
Commerce Clause regulation of intrastate activity only
where that activity is *economic* in nature" (emphasis
added)); *Lopez*, *supra*, at 560.  To evade even that modest

---

[6] Remarkably, the majority goes so far as to declare this question
irrelevant.  It asserts that the CSA is constitutional even if California's
current controls are effective, because state action can neither expand
nor contract Congress' powers.  *Ante*, at 27, n. 38.  The majority's
assertion is misleading.  Regardless of state action, Congress has the
power to regulate intrastate economic activities that substantially
affect interstate commerce (on the majority's view) or activities that are
necessary and proper to effectuating its commerce power (on my view).
But on either approach, whether an intrastate activity falls within the
scope of Congress' powers turns on factors that the majority is unwill-
ing to confront.  The majority apparently believes that even if States
prevented any medical marijuana from entering the illicit drug market,
and thus even if there were no need for the CSA to govern medical
marijuana users, we should uphold the CSA under the *Commerce*
Clause and the *Necessary* and Proper Clause.  Finally, to invoke the
Supremacy Clause, as the majority does, *ibid.*, is to beg the question.
The CSA displaces California's Compassionate Use Act if the CSA is
constitutional as applied to respondents' conduct, but that is the very
question at issue.

restriction on federal power, the majority defines economic activity in the broadest possible terms as the "'the production, distribution, and consumption of commodities.'"[7] *Ante*, at 23 (quoting Webster's Third New International Dictionary 720 (1966) (hereinafter Webster's 3d). This carves out a vast swath of activities that are subject to federal regulation. See *ante*, at 8–9 (O'CONNOR, J., dissenting). If the majority is to be taken seriously, the Federal Government may now regulate quilting bees, clothes drives, and potluck suppers throughout the 50 States. This makes a mockery of Madison's assurance to the people of New York that the "powers delegated" to the Federal Government are "few and defined," while those of the States are "numerous and indefinite." The Federalist No. 45, at 313 (J. Madison).

Moreover, even a Court interested more in the modern than the original understanding of the Constitution ought to resolve cases based on the meaning of words that are actually in the document. Congress is authorized to regulate "Commerce," and respondents' conduct does not qualify under any definition of that term.[8] The majority's opinion only illustrates the steady drift away from the text of the Commerce Clause. There is an inexorable expan-

---

[7] Other dictionaries do not define the term "economic" as broadly as the majority does. See, *e.g.*, The American Heritage Dictionary of the English Language 583 (3d ed. 1992) (defining "economic" as "[o]f or relating to the production, development, and management of *material wealth*, as of a country, household, or business enterprise" (emphasis added)). The majority does not explain why it selects a remarkably expansive 40-year-old definition.

[8] See, *e.g.*, *id.*, at 380 ("[t]he buying and selling of goods, especially on a large scale, as between cities or nations"); The Random House Dictionary of the English Language 411 (2d ed. 1987) ("an interchange of goods or commodities, esp. on a large scale between different countries . . . or between different parts of the same country"); Webster's 3d 456 ("the exchange or buying and selling of commodities esp. on a large scale and involving transportation from place to place").

sion from "'commerce,'" *ante*, at 1, to "commercial" and "economic" activity, *ante*, at 20, and finally to all "production, distribution, and consumption" of goods or services for which there is an "established . . . interstate market," *ante*, at 23. Federal power expands, but never contracts, with each new locution. The majority is not interpreting the Commerce Clause, but rewriting it.

The majority's rewriting of the Commerce Clause seems to be rooted in the belief that, unless the Commerce Clause covers the entire web of human activity, Congress will be left powerless to regulate the national economy effectively. *Ante*, at 15–16; *Lopez*, 514 U. S., at 573–574 (KENNEDY, J., concurring). The interconnectedness of economic activity is not a modern phenomenon unfamiliar to the Framers. *Id.*, at 590–593 (THOMAS, J., concurring); Letter from J. Madison to S. Roane (Sept. 2, 1819), in 3 The Founders' Constitution 259–260 (P. Kurland & R. Lerner eds. 1987). Moreover, the Framers understood what the majority does not appear to fully appreciate: There is a danger to concentrating too much, as well as too little, power in the Federal Government. This Court has carefully avoided stripping Congress of its ability to regulate *inter*state commerce, but it has casually allowed the Federal Government to strip States of their ability to regulate *intra*state commerce—not to mention a host of local activities, like mere drug possession, that are not commercial.

One searches the Court's opinion in vain for any hint of what aspect of American life is reserved to the States. Yet this Court knows that "'[t]he Constitution created a Federal Government of limited powers.'" *New York* v. *United States,* 505 U. S. 144, 155 (1992) (quoting *Gregory* v. *Ashcroft,* 501 U. S. 452, 457 (1991)). That is why today's decision will add no measure of stability to our Commerce Clause jurisprudence: This Court is willing neither to enforce limits on federal power, nor to declare the Tenth

Amendment a dead letter. If stability is possible, it is only by discarding the stand-alone substantial effects test and revisiting our definition of "Commerce among the several States." Congress may regulate interstate commerce—not things that affect it, even when summed together, unless truly "necessary and proper" to regulating interstate commerce.

## B

The majority also inconsistently contends that regulating respondents' conduct is both incidental and essential to a comprehensive legislative scheme. *Ante*, at 19–20, 21–22. I have already explained why the CSA's ban on local activity is not essential. *Supra*, at 7–8. However, the majority further claims that, because the CSA covers a great deal of interstate commerce, it "is of no moment" if it also "ensnares some purely intrastate activity." *Ante*, at 19. So long as Congress casts its net broadly over an interstate market, according to the majority, it is free to regulate interstate and intrastate activity alike. This cannot be justified under either the Commerce Clause or the Necessary and Proper Clause. If the activity is purely intrastate, then it may not be regulated under the Commerce Clause. And if the regulation of the intrastate activity is purely incidental, then it may not be regulated under the Necessary and Proper Clause.

Nevertheless, the majority terms this the "pivotal" distinction between the present case and *Lopez* and *Morrison*. *Ante*, at 20. In *Lopez* and *Morrison*, the parties asserted facial challenges, claiming "that a particular statute or provision fell outside Congress' commerce power in its entirety." *Ante,* at 20. Here, by contrast, respondents claim only that the CSA falls outside Congress' commerce power as applied to their individual conduct. According to the majority, while courts may set aside whole statutes or provisions, they may not "excise individ-

ual applications of a concededly valid statutory scheme."
*Ante*, at 20–21*;* see also *Perez* v. *United States,* 402 U. S.
146, 154 (1971); *Maryland* v. *Wirtz,* 392 U. S. 183, 192–193
(1968).

   It is true that if respondents' conduct is part of a "class of
activities . . . and that class is within the reach of federal
power," *Perez, supra,* at 154 (emphases deleted), then
respondents may not point to the *de minimis* effect of their
own personal conduct on the interstate drug market,
*Wirtz, supra,* at 196, n. 27.   *Ante,* at 6 (O'CONNOR, J.,
dissenting).   But that begs the question at issue: whether
respondents' "class of activities" is "within the reach of
federal power," which depends in turn on whether the
class is defined at a low or a high level of generality.
*Supra,* at 5.   If medical marijuana patients like Monson
and Raich largely stand outside the interstate drug mar-
ket, then courts must excise them from the CSA's cover-
age.   Congress expressly provided that if "a provision [of
the CSA] is held invalid in one of more of its *applications,*
the provision shall remain in effect in all its valid applica-
tions that are severable."   21 U. S. C. §901 (emphasis
added); see also *United States* v. *Booker,* 543 U. S. ___, ___
(2005) (slip op., at 9, and n. 9) (THOMAS, J., dissenting in
part).

   Even in the absence of an express severability provision,
it is implausible that this Court could set aside entire
portions of the United States Code as outside Congress'
power in *Lopez* and *Morrison,* but it cannot engage in the
more restrained practice of invalidating particular appli-
cations of the CSA that are beyond Congress' power.   This
Court has regularly entertained as-applied challenges
under constitutional provisions, see *United States* v.
*Raines,* 362 U. S. 17, 20–21 (1960), including the Commerce
Clause, see *Katzenbach* v. *McClung,* 379 U. S. 294, 295
(1964); *Heart of Atlanta Motel, Inc.* v. *United States,* 379
U. S. 241, 249 (1964); *Wickard* v. *Filburn,* 317 U. S. 111,

113–114 (1942). There is no reason why, when Congress exceeds the scope of its commerce power, courts may not invalidate Congress' overreaching on a case-by-case basis. The CSA undoubtedly regulates a great deal of interstate commerce, but that is no license to regulate conduct that is neither interstate nor commercial, however minor or incidental.

If the majority is correct that *Lopez* and *Morrison* are distinct because they were facial challenges to "particular statute[s] or provision[s]," *ante*, at 20, then congressional power turns on the manner in which Congress packages legislation. Under the majority's reasoning, Congress could not enact—either as a single-subject statute or as a separate provision in the CSA—a prohibition on the intrastate possession or cultivation of marijuana. Nor could it enact an intrastate ban simply to supplement existing drug regulations. However, that same prohibition is perfectly constitutional when integrated into a piece of legislation that reaches other regulable conduct. *Lopez*, 514 U. S., at 600–601 (THOMAS, J., concurring).

Finally, the majority's view—that because *some* of the CSA's applications are constitutional, they must *all* be constitutional—undermines its reliance on the substantial effects test. The intrastate conduct swept within a general regulatory scheme may or may not have a substantial effect on the relevant interstate market. "[O]ne *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce." *Id.*, at 600 (THOMAS, J., concurring). The breadth of legislation that Congress enacts says nothing about whether the intrastate activity substantially affects interstate commerce, let alone whether it is necessary to the scheme. Because medical marijuana users in California and elsewhere are not placing substantial amounts of cannabis into the stream of interstate commerce, Congress may not regulate them under the sub-

stantial effects test, no matter how broadly it drafts the CSA.

*    *    *

The majority prevents States like California from devising drug policies that they have concluded provide much-needed respite to the seriously ill.  It does so without any serious inquiry into the necessity for federal regulation or the propriety of "displac[ing] state regulation in areas of traditional state concern," *id.,* at 583 (KENNEDY, J., concurring).  The majority's rush to embrace federal power "is especially unfortunate given the importance of showing respect for the sovereign States that comprise our Federal Union." *United States* v. *Oakland Cannabis Buyers' Cooperative,* 532 U. S. 483, 502 (2001) (STEVENS, J., concurring in judgment).  Our federalist system, properly understood, allows California and a growing number of other States to decide for themselves how to safeguard the health and welfare of their citizens.  I would affirm the judgment of the Court of Appeals.  I respectfully dissent.